**FIDELITY & DEPOSIT COMPANY OF MARYLAND, Plaintiff,**

v.

**HUDSON UNITED BANK, Defendant.**

**Civ. A. No. 78–357.**

United States District Court, D. New Jersey.

June 23, 1980.

Lum, Biunno & Tompkins by Charles H. Hoens, Jr., and Roger P. Sauer, Newark, N.J., for plaintiff.

Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan by Roger A. Lowenstein, Newark, N.J., for defendant.

## OPINION

SAROKIN, District Judge.

This is an action by an insurer, Fidelity & Deposit Company of Maryland ("F&D"), for rescission of a banker's blanket bond alleging fraud by the insured, Hudson United Bank ("the Bank"), in procuring the bond. The Bank counterclaimed for recovery of certain losses allegedly compensable under the policy's employee dishonesty provision and other provisions. F&D moved, pursuant to Fed.R.Civ.P. 42(b), to bifurcate the claim for rescission. The motion was granted, and trial was held on the rescission claim only. The cause was tried by the Court without a jury.

█ The plaintiff, F&D, is a corporation organized and existing under the laws of the State of Maryland with principal offices in that state. During all pertinent times, F&D was in the business of writing various lines of insurance, including fidelity insurance for financial institutions. Defendant Bank was a commercial banking institution incorporated in New Jersey with principal offices therein. Jurisdiction is premised upon 28 U.S.C.A. § 1332(a). As this is a diversity action involving a claim for rescission of an insurance contract delivered and performed in New Jersey, the substantive law of that state is applicable. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

## FINDINGS OF FACT

On or about February 4, 1974, the Bank hired Robert Lee Potter as a senior loan officer in its commercial loan department; he was subsequently appointed Vice-President of the Bank in September of that year. On or about July 24, 1975, on Potter's recommendation to the board of directors, the Bank made loans eventually totaling $700,-000 to companies owned and controlled by one Thomas Mullens. In early 1976, said loans defaulted, and the Bank became aware of the losses resulting therefrom.

During January of 1976, Joseph L. Robertson was appointed President of the Bank. Upon assuming his duties, Robertson conducted an examination of certain documents at the Bank, including those relating to the Mullens' loans. As the result of his examination, Robertson found: (1) that there had been improper cashing of corporate checks contrary to standard banking practices; (2) that Potter had given his approval to the cashing of corporate checks for the Mullens' companies; (3) that there were inconsistencies between the presentations made by Potter to the board of directors regarding the Mullens' loans and the documentation supporting same contained in the loan files; (4) that the loans which were recommended by Potter and approved by the board of directors should not have been granted based upon the documentation contained in the file; (5) that certain of the financial statements submitted in connection with said loans had been incorrectly totalled; (6) that the financial statements contained pencilled changes; and (7) that said statements had been prepared by a fictitious, non-existent accounting firm.

As the result of his investigation, Robertson reported to the board of directors of the Bank on February 10, 1976 that the Mullens' loans were apparently worthless, and that Mullens was in the custody of federal authorities. On February 19, 1976, Robertson wrote to the Federal Deposit Insurance Corporation ("F.D.I.C.") outlining what he had discovered as the result of his investigation ("the F.D.I.C. letter"—See Appendix). Copies of the letter were forwarded to the Department of Banking of the State of New Jersey, the Federal Bureau of Investigation, the Hudson County Prosecutor's office, the United States Attorney's office and Scarborough and Company (Hudson's insurance broker and agent for Employers Mutual Liability Insurance Company of Wisconsin ("Employers")). On Febru-

ary 27, 1976, the Bank issued a letter to shareholders describing what had occurred respecting the Mullens' loans.

During this time period, the Bank was insured under a fidelity bond issued by Employers. The policy was a "claims made" policy that insured against specific losses resulting from acts occurring at any time, provided that such losses were *discovered* during the policy period. In late 1975 and early 1976, the Bank considered obtaining coverage elsewhere and solicited four insurance companies. The Bank forwarded an application for insurance to plaintiff F&D on or about January 27, 1976.[1]

In March 1976, prior to the issuance of its bond, F&D was advised that the Bank had sustained certain losses and as a result, "possible pending fraud" claims existed. On March 12, 1976, F&D requested further information respecting the possible pending fraud losses by letter directed to the Bank. No response to that letter, either oral or written, was ever received by F&D from the bank. The Court finds that neither the F.D.I.C. letter nor the letter of February 27, 1976, from the Bank to its stockholders was submitted to F&D.

On March 19, 1976, Employers advised the Bank that it would not renew the existing coverage. Prior thereto, Hartford Insurance had advised the Bank that it would not provide coverage. Therefore, the Bank ordered the bond from F&D, which bond was issued on March 21, 1976.[2]

As of the date of the issuance of the policy, the Bank had not advised F&D of the nature and extent of the Mullens' losses, the discrepancies between the loan files and the recommendations made by Potter, the issuance or content of the F.D.I.C. letter or the existence of an investigation by counsel for Employers regarding the Mullens' losses in order to determine whether or not the Bank had a compensable claim under the existing policy with Employers.

Robertson, as bank president, believed that it was important that all of the aforesaid information be forwarded to F&D as part of its application disclosure. He instructed that the information be transmitted and was under the impression that it had been so provided. He testified it was of particular importance that F&D receive a copy of the F.D.I.C. letter which contained a summary of all that had transpired respecting the Mullens' losses.

Harold J. Fitzgerald, in charge of underwriting the fidelity bonds for F&D, testified that had he received the F.D.I.C. letter, F&D would not have written the coverage and issued the bond. The Court finds that if F&D had received the F.D.I.C. letter or otherwise been informed of the information respecting the Mullens' loans, F&D would not have provided the coverage represented by the bond issued on March 21, 1976. The Bank offered no proof to the contrary.

In November 1976, the Bank submitted a formal written proof of claim to Employers pertaining to the Mullens' loans. The facts

1. The application was an "Application-Questionnaire for a Banker's Blanket Bond, Standard Form No. 24". The application requested information on the Bank's loss experience over the previous six years including the date of loss, amount of loss, amount recovered from insurance, amount of loss pending, and type of loss. The Bank responded to this inquiry by stating, "No losses Paid by Insurance Carriers During the Past Six Years." In addition, the Bank certified in the application that, "The present officers and employees of the Insured, of whom a complete list at this time, with positions held, is given above, have, to the best of the Insured's knowledge and belief, while in the service of the Insured always performed their respective duties honestly. There has never come to its notice or knowledge any

information which in the judgment of the insured indicates that any of the said officers and employees are dishonest. Such knowledge as to any officer signing for the Insured may now have in respect to his own personal acts or conduct, unknown to the Insured is not imputable to the Insured."

2. F&D's fidelity coverage included, "Loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss through any such act of any of the Employees, of Property held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor."

asserted with respect to the claim against Employers were identical to the facts contained in the proof of loss filed against F&D on November 24, 1976. On or about December 27, 1977, the Bank instituted suit against Employers under its bond alleging employee dishonesty. A default judgment was entered in that proceeding predicated upon proofs submitted by the Bank. When Employers moved to vacate the default judgment, the Bank resisted on the grounds that Employers did not have a meritorious defense. Nonetheless, the default judgment was vacated and an Answer was filed by Employers. During pretrial proceedings, the Bank filed a statement of factual contentions, alleging that the losses sustained in connection with the Mullens' matter were compensable under the Employers bond. Thereafter, the Bank and Employers entered into a settlement.

Commencing in July 1976, the Bank advised F&D of its claims under the subject bond. In early 1977, F&D became aware of the fact that dual and identical claims had been filed against it and Employers. The bond was cancelled by F&D effective April 9, 1977. After investigation and consultation with counsel, F&D determined to rescind its bond with the Bank on the ground that the Bank had discovered evidence of employee dishonesty prior to March 21, 1976, the effective date of the bond, and failed to disclose same to F&D. Notice of rescission was forwarded to the Bank by F&D on January 31, 1978.

In summary, prior to March 21, 1976, the Court finds that the Bank had knowledge of the following:

1. The facts as set forth in the F.D.I.C. letter including the fact that Mullens had defrauded the Bank in connection with certain loans;

2. That corporate checks of Executive Investments, a Mullens' company, were being cashed and approved by Potter whose explanation for cashing said checks was unsatisfactory;

3. That the structure of the loans to Executive Investments was improper;

4. That there were inconsistencies between Potter's recommendation to the board of directors regarding the loans and the documentation allegedly supporting said loans as contained in the relevant files;

5. That the accounting statements upon which the Mullens' loans were predicated were fictitious and the accountant non-existent;

6. That said financial statements contained pencilled changes;

7. That Employers, which had refused to renew its bond, had been advised of the Mullens' losses by the Bank and had received a copy of the F.D.I.C. letter; and

8. That, based upon his testimony, Mr. Robertson, as President of the Bank, would not have granted the Mullens' loans and would have disclosed to F&D the knowledge the Bank possessed at that time concerning said loans.

## CONCLUSIONS OF LAW

The applicant for a fidelity bond is under a duty to make full disclosure of all facts upon which the bonding company might reasonably rely in evaluating the risks to be insured. The insured should "advise the insurer of such matters that [it] knows [or has reason to believe] might influence the insurer in [accepting] or declining the risk, [particularly] where such facts are not of record and are not discoverable therefrom by the insurer. See *Gallagher v. New England Mut[ual] Life Ins[urance] Co. of Boston*, 19 N.J. 14 [114 A.2d 857] (1955); [and] *Weir v. City Title Ins[urance] Co.*, 125 N.J.Super. 23 [308 A.2d 357] (App.Div.1973)." *Pioneer National Title Insurance v. Lucas*, 155 N.J.Super. 332, 338, 382 A.2d 933, 936 (App.Div.1978), aff'd 78 N.J. 320, 394 A.2d 360 (1978). *Accord, Apolskis v. Concord Life Insurance*, 445 F.2d 31, 35 (7th Cir. 1971), *Stipcich v. Metropolitan Life Insurance Co.*, 277 U.S. 311, 316–317, 48 S.Ct. 512, 513–514, 72 L.Ed. 895 (1928); *Metropolitan Life Insurance Co. v. Chambers*, 142 N.J.Eq. 440, 443, 60 A.2d 244 (Ch.1948), See, *Jewish Center of Sussex v. Whale*, 165 N.J.Super. 84, 397 A.2d 712 (Ch. 1978). Therefore, *assuming* that the Bank

did not know or believe that employee dishonesty was involved in any of the losses which were discovered prior to the issuance of the bond by F&D, nonetheless, it was under a duty to advise F&D of all of the information known to it prior to March 21, 1976, (the date upon which the bond was issued) which reasonably related to the risks to be covered. The failure to disclose such information is not excused by an honest belief that the losses or potential losses within the knowledge of the Bank did not involve a risk which would be covered by the bond, if issued. In this matter information was specifically requested (March 12, 1976 letter to F&D) and was material to the insurer in deciding whether to insure the risk (testimony of Harold J. Fitzgerald). A fact is material if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the insurer in determining whether to undertake the risk, or in estimating its degree or character, or in fixing the rate of the premium. *Kozlowski v. The Pavonia Fire Insurance Company*, 116 N.J.L. 194, 198, 183 A. 154 (E. & A.1936), *Gallagher v. New England Mutual Life Ins. Co., supra.* See, *Urback v. Metropolitan Life Ins. Co.*, 127 N.J.L. 585, 23 A.2d 568 (E. & A.1942). The failure to provide information where there is a duty to disclose is equivalent to an affirmative misrepresentation. *Jewish Center of Sussex v. Whale, supra,* 165 N.J.Super. at 89, 397 A.2d 712; *Costello v. Porzelt*, 116 N.J.Super. 380, 383, 282 A.2d 432 (Ch.1971).

The circumstances which came to the attention of the Bank at or about the time it submitted its bond application and continued until the effective date of the bond presented serious symptoms which were not then susceptible of any final diagnosis. It was too early to rule out the possibility of employee dishonesty, and as the facts subsequently developed, the losses were due in part to such employee dishonesty.

■ In the face of such losses, coupled with the fact that the Bank had commenced rather than concluded its investigation, F&D was entitled to be made aware of said circumstances so that it could make its own determination whether it wished to issue the bond and insure the risks incident thereto, without further investigation and information.

The Bank should have exercised the same caution in regard to its prospective carrier as it did to its existing carrier. Although acting under the honest belief that the losses were not covered by its existing bond, it nonetheless advised Employers of the circumstances. Through that very same means and even utilizing the identical document, the Court finds that Fidelity should have been so advised.[3]

■ Under the law of New Jersey, this Court does not need to find that the Bank deliberately and consciously intended to conceal such information from F&D in order to grant the relief sought by the plaintiff in this matter. There is no evidence of a conscious intention to conceal. The information concerning the losses appeared in newspapers, and the bank issued a press

---

**3.** Defendant places primary reliance upon cases which concern when a loss is "discovered" under a "claims made" policy for purposes of submitting notice of loss. E. g., *Midland Bank and Trust Co. v. Fidelity & Deposit Company of Maryland*, 442 F.Supp. 960 (D.N.J. 1977), *United States Fidelity & Guaranty Company v. Empire State Bank*, 448 F.2d 360 (8th Cir. 1971); *Jefferson Bank & Trust Co. v. Central Surety & Insurance Corp.*, 408 S.W.2d 825 (Mo.1966). In *Empire*, the case defendant denominated "most apposite to the present controversy", the court stated, "[s]uspicion alone does not satisfy the test of discovery. *Jefferson Bank & Trust Co., supra.* A realization that a highly respected and able bank official has betrayed his trust should and would come

hard to those who trusted him." *Empire, supra*, at 366. The *Empire* court also emphasized that "discovery" imports an awareness of the *significance* of known facts. *Empire, supra,* at 365. In that case, the insurer argued, too, that the bond should be voided because of failure to disclose in the application suspicions of employee dishonesty. In response, the court noted, "[w]e find no provision of the policy, nor of the application, requiring the Bank to give credence to rumors concerning former employees *by reporting them for possible investigation to* a prospective insurer." *Empire, supra,* at 366.

The facts of this case, which caused the Bank to place its then carrier on notice, were sufficient to cause it to furnish its *prospective* carrier with the same notice.

release and a report to stockholders. The Bank, in March 1976, advised F&D of possible pending fraud claims, although it did not respond to F&D's request for further information.[4]

■ New Jersey permits an insurer to rescind for equitable fraud, where the misrepresentation of a material fact is innocently made, as well as for legal fraud which requires conscious falsehood. *E. g., Equitable Life Assur. Soc. v. New Horizons, Inc.,* 28 N.J. 307, 314, 146 A.2d 466 (1958); *Gallagher v. New England Mutual Life Ins. Co., supra,* 19 N.J. at 20, 114 A.2d 857; *Metropolitan Life Ins. Co. v. Tarnowski,* 130 N.J.Eq. 1, 3, 20 A.2d 421 (E. & A.1941); *Metropolitan Life Ins. Co. v. Lodzinski,* 124 N.J.Eq. 357, 359, 1 A.2d 859 (E.& A.1938); *Russ v. Metropolitan Life Ins. Co.,* 112 N.J. Super. 265, 274, 270 A.2d 759 (Law Div. 1970); *Formosa v. Equitable Life Assurance Society,* 166 N.J.Super. 8, 13, 398 A.2d 1301 (App.Div.1979); *Travelers Insurance Company v. Evslin,* 101 N.J.Eq. 527, 531, 139 A. 520 (Ch.1927).

■ Equitable fraud appears to be a concept adopted by the courts primarily in life insurance cases. But see, *State Farm Mutual Insurance Company v. Wall,* 87 N.J. Super. 543, 548, 210 A.2d 109 (Law Div. 1965), mod. on other grnds., 92 N.J.Super. 92, 222 A.2d 282 (App.Div.1962). The Court

finds that an intention to conceal is not a prerequisite to the relief sought by the plaintiff in this matter because of the nature of the insurance here at issue, a "claims made" policy, which, as previously stated, provides that the insurer is liable for losses sustained when discovered as opposed to when they occurred. Therefore, in determining whether or not to issue such a policy, it is imperative that the insurer receive complete disclosure of all losses which have been or may be incurred which reasonably relate to the risks insured. The morality of the marketplace in such matters should require the applicant for such coverage to err on the side of disclosure. The insurer should be placed in the position of determining the relevancy of the losses and their impact on the proposed underwriting, rather than be required to rely upon the applicant's unilateral assessment.

Many cases which reject the concept of equitable fraud involve individual policyholders in an unequal bargaining position with insurance companies. In this matter, the parties are experienced and sophisticated. As between the party who has the knowledge and fails to disclose it and the party who must underwrite the risk based upon such knowledge, this Court has no difficulty in balancing the scales of justice in favor of the party who committed no

4. The fact that F&D requested this information and sought to investigate the matter further does not relieve the Bank of its duty of disclosure, particularly where the investigation was directed at information peculiarly within its own control. The Third Circuit, in *Parker Precision Products Co. v. Metropolitan Life Ins. Co.,* 407 F.2d 1070, 1074–1075 (1969), a case involving rescission of a life insurance policy, stated:

Although Metropolitan clearly embarked on an independent investigation by requesting medical reports, reliance on Parker's representations were not clearly precluded. (footnote omitted) "The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry."

*John Hancock Mut. Life Ins. Co. v. Cronin,* 139 N.J.Eq. [392] at 398, 51 A.2d [2] at 5. . . . In determining whether this impressed Metropolitan with a duty of further inquiry, one factor to be considered is what avenues of investigation lay open at the time . . . .. Had Metropolitan in 1962 any reason to know of the 1957 EKGs, it might have been obligated to make further investigation. But can it be charged with knowledge of, or with a duty to seek, medical data whose very existence and import were within the sole possession of a physician who was willing to represent that he had taken only a 1960 EKG which was normal? We think not. A liability so broad was expressly rejected in the *Cronin* case, *supra.*

*Cf., Jewish Center of Sussex v. Whale,* 165 N.J.Super. 84, 90, 397 A.2d 712 (Ch.1978) (failure of plaintiff to investigate cannot relieve defendant of consequences of failure to disclose obviously material information.)

wrong and against the party who committed the wrong, even though innocently.

The foregoing presupposes that the Bank had no actual knowledge of employee dishonesty. Obviously, if the Bank had such knowledge, it was under a duty to disclose same to F&D. When one acquires such knowledge is not necessarily a precise moment in time.

In *City Loan and Savings Company v. Employers' Liability Assur. Corp.*, 249 F.Supp. 633, 658 (N.D.Ohio 1964), aff'd 356 F.2d 941 (6th Cir. 1966), the district court noted:

> "[T]he knowledge or discovery of dishonesty does not depend upon knowledge or discovery of the full scope and exact details of the entire affair. (cites omitted) Knowledge or discovery of dishonesty does not depend upon knowledge of the total misconduct when viewed in retrospect and with the obvious advantages of hindsight, but rather upon knowledge of facts which, in the light of proven circumstances surrounding those facts and in the light of reasonable inferences which can be drawn from those facts, would inform the ordinary, reasonable and sensible employer that dishonesty has occurred which might involve the surety in liability (cites omitted) . . . The discovery of dishonesty does not depend upon a confession or the ability to brand a specific employee as a thief."

In addition to the facts set forth which suggest that the Bank might have reasonably inferred or suspected employee dishonesty, some evidence exists of actual knowledge by the Bank of employee dishonesty prior to the issuance of the bond on March 21, 1976. In answer to interrogatories served upon the Bank in the suit which it instituted against Employers, the Bank furnished the following response when asked to set forth the reasons for termination of Potter: "Mr. Potter was terminated on February 10, 1976 because of suspected dishonesty in connection with the Mullens group of loans."

Furthermore, in connection with the claim made by the Bank against Employers under a similar "claims made" policy covering losses from employee dishonesty discovered prior to March 21, 1976, the Bank filed a proof of loss and a complaint, offered evidence in support of a default judgment and opposed the vacation of said default judgment.

The premise underlying the position taken and the documents filed in the Employers' litigation is that the employee dishonesty contributing to the losses sustained by the Mullens' loans was discovered during the term of the Employers' bond; and therefore, by necessity, before the issuance of the F&D bond. The pleadings and proofs in the Employers' action are admissible against the Bank in this proceeding. Prior assertions made in pleadings which are inconsistent with or contradictory of present claims can be treated as an admission in subsequent litigation. *New Amsterdam Casualty Company v. Popovich*, 31 N.J.Super. 514, 107 A.2d 345, aff'd. 18 N.J. 218, 224, 113 A.2d 666 (1955); *Lincks v. Erie Railroad Co.*, 97 N.J.L. 343, 344, 116 A. 493 (E. & A.1922); *Daily v. Somberg*, 49 N.J.Super. 469, 479, 140 A.2d 429 (Law Div.1958), rev'd on other grnds., 28 N.J. 372, 146 A.2d 676 (1958); *Appleby v. Obert*, 16 N.J.L. 336 (1838); *Ross v. Philip Morris & Co.*, 328 F.2d 3, 14–15 (8th Cir. 1964). *Cf., Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1147 (5th Cir. 1978), *reh. den.* 570 F.2d 1391 (prior pleadings are admissible if they indicate that the party against whom they are admitted adopted a position inconsistent with that in earlier litigation); *Rapid Transit Lines v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir.1970) (allegation in previous lawsuit between same parties over same subject matter was a quasi-admission under Kansas law). But see, *Continental Insurance Co. of New York v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971); *Giannone v. United States Steel Corp.*, 238 F.2d 544, 547–548 (3rd Cir. 1956).

The issue is whether such pleadings and proofs are dispositive of the assertions made by the Bank in this matter and whether the Bank is estopped from asserting a contrary legal and factual position in this proceeding.

The Court recognizes that a claimant faced with a dilemma as to which of two bonding companies might be responsible for losses sustained would, in the exercise of caution, file duplicate proofs of loss and would consider the institution of legal actions against both companies. Competent counsel might well advise a client to pursue such a course of action in order to protect and preserve whatever rights might exist against either or both companies.

■ Plaintiff asserts that the defendant having initiated another action predicated upon an allegation that the losses were in fact discovered prior to the issuance of the bond by plaintiff is now precluded from asserting and proving a contrary fact in this proceeding. Plaintiff argues that the filing of the pleading in said action in and of itself would be sufficient to obtain a dismissal of the within action. The Court cannot accept that concept. If plaintiff is correct in its position, the defendant by filing such inconsistent actions would in effect cancel out the claims against both companies. If F&D had the right to a dismissal on the merits because of the allegations made by the Bank against Employers, then likewise Employers would have the right to a dismissal of the Bank's action against it because of its proceeding against F&D. Such a result would be intolerable. Therefore, the Court concludes that the mere filing of duplicate proofs of claim and complaints, although concededly inconsistent as a matter of fact and law, does not entitle either bonding company to a dismissal.

However, at some point the claimant is called upon to prove when in fact it learned of the employee dishonesty, a fact peculiarly within its own knowledge. By its very nature, the claim asserted by the Bank in this matter is valid as against *one* of the two companies, but not both. Since it is predicated upon the time when it discovered the loss, that is a fact requiring proof by the Bank. Plaintiff urges that having asserted in the Employers action, not only by pleading but the subsequent proofs, that it had discovered the employee's dishonesty

during the term of the Employers' bond and therefore before the issuance of the F&D bond, the Bank cannot in this action assert a contrary fact, namely that it did not know of the employee's dishonesty before the F&D bond was issued.

■ Plaintiff denominates the principle of law involved here as a "judicial admission" which is "universally conceded to be its conclusiveness upon the party making it." (Plaintiff's Proposed Conclusions of Law at 29). Pleadings may be judicial admissions but only in the cause in which they are made. "When used in other causes as ordinary admissions, they are of course . . . *not conclusive* : . . .." IV Wigmore on Evidence, § 1066 at 86 (3d ed. 1940). Accord, *Lapayowker v. Lincoln College Preparatory School*, 386 Pa. 167, 125 A.2d 451, 456 (1956), overruled on other grounds, *Butler v. Butler*, 464 Pa. 522, 347 A.2d 477 (1975); *Drake v. United States*, 153 Ct.Claims 433 (1961). This is especially true where the party has taken a position inconsistent with a prior unadjudicated proceeding where he never had an opportunity to prove the allegations or recitals, E.g., *Ham v. Gouge*, 214 Pa.Super. 423, 257 A.2d 650, 653 (1969) ("At most, the defendants' pleadings in the prior action were admissible as admissions and which they had the right to contradict by other evidence."); *Associates Discount Corp. v. Kelly*, 169 Pa. Super. 74, 82 A.2d 689 (1951).

■ For the reasons already expressed, the Court does not deem it necessary to rely upon the position taken by the Bank in its suit against Employers in order to hold that it failed in its duty of disclosure to F&D, since the Court has concluded that the Bank breached its duty of disclosure, even in the absence of a finding that it was aware of employee dishonesty prior to the issuance of F&D's bond. However, if a finding of the Bank's actual knowledge of employee dishonesty prior to the issuance of said bond were necessary, there is evidence to support said finding in the admissions contained in the suit filed by the Bank against Employers.

The Bank offered testimony in this proceeding in direct contradiction of the pleadings and facts relied upon by it in the suit against Employers. Based upon that testimony, the Court concluded that although there might have been some grounds to be suspicious of employee dishonesty, the Bank had an honest belief that such employee dishonesty was not involved at the time it sought the issuance of a bond from F&D. The question remains, however, whether this Court should consider such testimony in the light of the position taken by the Bank in the Employers' action, wherein it pleaded and proved that it had knowledge of employee dishonesty prior to the issuance of the F&D bond. This Court is sympathetic to the view espoused by F&D that a claimant not be permitted to use the courts to assert a legal and factual position in one proceeding and then be permitted to offer evidence in another proceeding in direct contradiction of the factual and legal position taken by it in the earlier proceeding.

The courts have always recognized the right of a litigant to be inconsistent in certain instances, Fed.R.Civ.P. 8(e)(2), but this case involves more than inconsistent pleadings. It involves verifications and certifications under oath with penalties of perjury asserting an essential fact necessary to recovery which, by its very nature, is not susceptible of two versions. Certainly, if this had been a single action instituted against both bonding companies, the Bank would have been required to elect which factual contention it sought to pursue. The requirement is not different merely because two separate actions are involved.

Therefore, it is the conclusion of the Court that the Bank is estopped to assert in this proceeding that it did not learn of the employee dishonesty until after the issuance of the F&D bond. A litigant should not be permitted to alter its factual position to serve its own purposes. Having submitted and relied upon facts in another proceeding, although there are proofs to the contrary, it has forfeited its right to rely upon such proofs in a subsequent proceeding. New Jersey law accords with this conclusion. In *Tabloid Lithographers, Inc. v. Israel*, 87 N.J.

Super. 358, 365–66, 209 A.2d 364, 369 (Law Div.1965), the court ruled that the plaintiff could not present evidence under oath contradicting his prior affidavit, stating: "If one statement is true, the other cannot be. In *In re Perrone*, 5 N.J. 514, 76 A.2d 518 (1950), Chief Justice Vanderbilt said for the Supreme Court: "Although a party may argue inconsistent principles of law, he cannot be heard here to contend for two diametrically opposed sets of facts." (at p. 524, 76 A.2d at p. 524.) In *Stretch v. Watson*, 6 N.J.Super. 456, 69 A.2d 596 (Ch.Div.1949), Judge . . . Haneman said: " 'A party will not be permitted to play fast and loose with the courts, nor to assume a position in one court entirely different from and inconsistent with that taken by him in another court or proceeding with reference to the very same matter or thing. (at p. 469, 69 A.2d at p. 603)' " Although not quoted by the court in *Tabloid, supra*, Judge Haneman in *Stretch* continued in similar vein, adopting the following from Am.Jur., § 72, p. 704 *et seq.*:

"The rule that a party will not be allowed to maintain inconsistent positions is applied in respect of positions in judicial proceedings. As thus applied it may be regarded not strictly as a question of estoppel, but as a matter in the nature of a positive rule of procedure based on manifest justice and, to a greater or less degree, on considerations of orderliness, regularity, and expedition in litigation . . . .. The principle requiring consistency in judicial proceedings is, however, customarily considered a form of equitable estoppel."

One further comment is appropriate regarding the suit which the Bank instituted against Employers. The Court conditionally accepted proof of the terms and conditions of the settlement consummated in that matter. F&D argues that the acceptance of monies by the Bank in that proceeding was a further admission on its part that the employee dishonesty was discovered prior to the issuance of a bond. F&D urges that such settlement is a further fact which this Court should consider

in establishing the course of conduct by the Bank in the Employers' proceeding, namely that it filed a proof of claim, a pleading and proofs, entered a default judgment, opposed the vacation of said judgment, and ultimately accepted monies in that proceeding, all of which should be considered by this Court as being inconsistent with its present assertion that it had no knowledge of employee dishonesty during the term of the Employers' bond and prior to the issuance of the F&D bond. Rule 408 of the Federal Rules of Evidence [5] clearly prohibits admission of compromises and offers of compromise to prove liability for or invalidity of a claim or its amount. It is argued that the settlement of the Employers' matter is not being offered as an admission of liability by any party thereto but rather as an admission of the existence of a claim, and, therefore, that the Court should consider the acceptance by the Bank of monies from Employers as a further admission by it that the employee's dishonesty was discovered during the course of the Employers' bond. In other words, the Bank should not have accepted any monies from Employers unless it believed in good faith that the loss was discovered during the term of the Employers' bond. For the reasons already expressed, it would not be necessary for this Court to rely upon such evidence in reaching its final determination. There is sufficient evidence in this matter to justify the granting of relief sought by F&D without reliance upon the settlement. However, it is the Court's view that the objection to the admissibility of such evidence pertaining to the terms and conditions of the settlement and even the fact of same should be sustained. The admission of such testimony would violate the underlying purpose of the rule which is to encourage settlement.

The Rule codifies the general practice of the federal courts that compromise agreements are inadmissible as proof of invalidity of the claim. *E. g., Broadway & Ninety Sixth St. Realty Co. v. Loew's Inc.,* 21 F.R.D. 347, 358–359 (S.D.N.Y.1958), *Meek v. Miller,* 1 F.R.D. 162, 163 (M.D.Pa.1940), *Milton S. Kronheim & Co. v. United States,* 163 F.Supp. 620, 143 Ct.Cl. 390 (1958). In *Kronheim,* the Court said, "[t]he reason for the refusal of the courts to infer an admission of liability from the mere fact of a compromise or settlement lies both in the policy of the law to encourage settlement of litigation and in the realization that it is often more advantageous, economical and desirable for a party to 'buy his peace' than to go through litigation even when his chances of prevailing are great." 163 F.Supp. at 628. The federal policy encourages negotiation of settlements "by preventing the parties to the compromise from being tied elsewhere to the concession they made *inter sese.* See, F.R.Ev. 408 Adv.Comm.Notes." *McShain, Inc. v. Cessna Aircraft,* 563 F.2d 632, 635, n.5 (3d Cir. 1977).

The Court sees no distinction between utilizing the settlement as an admission of liability and using it as an admission of the validity of a claim. If the settlement should not have been utilized against the party recognizing the claim and making payment in settlement thereof, it should likewise not be utilized against the party asserting the claim and accepting payment thereunder. Therefore, the Court did not rely upon the terms and conditions of the settlement nor the fact thereof in reaching its final determination that the Bank is estopped from now asserting a position contrary to that which it asserted in the Employers' litigation.

■ The facts presented entitle the plaintiff to rescission. *Equitable Life As-*

---

**5.** Rule 408. Compromise and Offers to Compromise Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. . . . This rule does not re-

quire the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the *evidence is offered for another purpose,* such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

**446**

*sur. Soc. v. New Horizons, Inc., supra; Metropolitan Life Ins. Co. v. Tarnowski, supra; Metropolitan Life Ins. Co. v. Lodzinski, supra; Russ v. Metropolitan Life Ins. Co., supra; Formosa v. Life Assurance Society, supra; Travelers Insurance Company v. Evslin, supra; Gallagher v. New England Mutual Life Ins. Co., supra; State Farm Mutual Insurance Co. v. Wall, supra.* The Bank made representations upon which the bonding company was entitled to rely. The bonding company in fact relied upon said representations and issued its bond. The underwriter for the bonding company testified that had he received the information which was in the possession of the Bank prior to the issuance of the bond, the bond would not have been written. Said testimony was uncontradicted, and no expert or other testimony was offered to the contrary. Certainly, F&D would be substantially damaged if it was required to honor the loss claims which have been filed by the Bank.

The Court considered alternatives short of the drastic remedy of rescission. The bank argues that, had the appropriate facts been disclosed to F&D, that rather than denying coverage, it would have adjusted its premium. There was testimony to the effect that F&D was anxious to procure additional insurance from the Bank and that it might have considered a premium adjustment rather than a rejection of the Bank's bond application in order to obtain the additional business. The Court finds that there is no basis for it to reach such a conclusion and that to do so would be mere speculation on its part. The Bank cannot compel the bonding company to accept a premium adjustment, when its acts deprived F&D of the opportunity to make that judgment at the time of the issuance of the bond, because of the Bank's failure to disclose to F&D all of the pertinent and essential facts necessary to reach such decision at the time.

The Court also considered whether an appropriate remedy in this matter would be to exclude from the bond coverage the losses pertaining to Mr. Potter, the dishonest employee, and any activities on his part, but otherwise to continue the bond as to those losses which in no way related to the employee dishonesty ultimately discovered. Why should the bonding company be relieved from paying losses unrelated to the dishonesty of said employee, such as a robbery loss? The answer simply is that the bonding company was entitled to make a decision as to whether it would or would not issue a bond after a full disclosure by the Bank of all relevant information. Having failed to meet that duty, the bonding company is entitled to assert and has shown through competent expert testimony that it would not have undertaken the risk if the relevant facts had been disclosed to it. Therefore, under the circumstances of this case, the Court cannot compel the bonding company to continue any part of the coverage offered by said bond, when the uncontradicted evidence reveals that the bond would not have been written, if the information within the possession of the bank had been disclosed.

Therefore, the Court concludes that F&D is entitled to rescission of the bond, unless it waived its right of rescission. The leading New Jersey case on the doctrine of waiver of the right to rescind an insurance contract is *Merchants Indemnity v. Eggleston*, 37 N.J. 114, 130–131, 179 A.2d 505, 513–14 (1962) in which the Supreme Court stated:

> When a contract is obtained by fraud, the law grants the injured party a choice. He may rescind or affirm. If he rescinds, he must return what he received. . . . On the other hand, he may choose to affirm the contract, whereupon he retains the consideration he received and has as well a claim for money damages for deceit, which in the circumstances of a liability policy would probably be at best a claim for such additional premium as should have been paid for the coverage. But the defrauded party must thus elect which course he wishes to follow. He cannot pursue both. If he elects to continue with the contract, the election is final and the contract is affirmed, not because he wants it to be, but because the

law makes it so. And if by his conduct he affirms the contract, he cannot be heard to say that he did not "voluntarily" or "intentionally" relinquish his right to call off the deal. (cites omitted) Neither consideration nor detriment is necessary to support the finality of the choice. (cite omitted).

. . . In short, if a carrier receives information suggesting fraud or breach of contract, it must seek the facts with reasonable diligence, and having acquired them it must within a reasonable period decide whether to continue to perform. What is a reasonable time depends upon the circumstances.

 For an effective waiver of its right to rescind, F&D must have had knowledge of that right, e. g., F&D would have to have been aware that the Bank withheld information of employee dishonesty prior to the effective date of the fidelity bond. See, *Locicero v. John Hancock Mutual Life Ins. Co.*, 32 N.J.Super. 300, 308, 108 A.2d 281 (App.Div.1954); *Goldstein v. Metropolitan Cas. Ins. Co.*, 10 N.J.Super. 291, 293–294, 71 A.2d 51 (Law Div.1950), aff'd 14 N.J.Super. 214, 81 A.2d 797 (App.Div.1951); *Ajamian v. Schlanger*, 20 N.J.Super. 246, 89 A.2d 702 (App.Div.1952).

Plaintiff states that in July 1976, the Bank began to furnish F&D with notices of claim based on losses due to employee dishonesty. Plaintiff alleges that it first became aware of dual reporting of losses to both itself and Employers in or about February 1977. By that month, partly because of these losses, F&D decided to cancel the Bank's bond. However, plaintiff asserted that it was not until counsel for F&D met with Employers' counsel in December 1977 that F&D decided unequivocally that employee dishonesty had been discovered prior to March 21, 1976 and, therefore, notified the Bank on January 13, 1978 that it elected to rescind the bond.

Defendant, on the other hand, urges that from February 1977 until the rescission date, no additional information concerning the filing of claims with both Employers and F&D came to the attention of the bonding company. Therefore, when F&D granted the Bank an extension of the bond's cancellation date, effectively terminating it on April 9, 1977, and allowed the Bank to purchase an additional 12-month discovery period rider, (an option which was part of the original contract and which became effective April 9, 1977), it affirmed the bond. Defendant also rejects F&D's assertion that it *finally* knew of the dual filing of notice of claim when F&D received confirmation from Employers' counsel in December 1977, arguing that in addition to having all relevant information by February 1977, F&D could easily have inquired much earlier than December of any of a number of people, including the Bank and its attorneys or counsel for Employers, to receive confirmation.

 The Court notes that the Bank's testimony indicated the substantial length of time which was required for it to reach a determination that indeed the losses had been the result of employee dishonesty. Since that information was more readily accessible to it than to F&D, it is difficult for the Court to accept the concept that F&D should be expected to act any more expeditiously than the Bank did to discover the employee's dishonesty *and additionally to discover* that the Bank *knew* of such employee dishonesty prior to the issuance of the F&D bond. It recognized, as the Court recognizes, that rescission is a drastic remedy and F&D properly awaited the conclusion of its investigation and the advice of counsel before acting. The delay was not unreasonable under the circumstances.

This is especially true since the Bank was not prejudiced by such delay. The Bank asserts that F&D's delay in asserting the rescission claim prejudiced its ability to defend that claim since A. K. Bennett, F&D's Senior Claims Examiner who visited the Bank and spoke to its attorneys in investigating the Mullens' losses, is now deceased. Other than this occurrence, the Bank is unable to point to any circumstances which indicate a change of position on its part by reason of the alleged delay by F&D in rescinding the bond. There is no evidence

in this case that had there been an earlier rescission by F&D, the Bank could have obtained similar or identical coverage from another bonding company.

Therefore, the Court concludes that there was no waiver of the plaintiff's right of rescission.

For the reasons set forth, it is hereby ORDERED and ADJUDGED that Bond No. 5957395 issued by F&D to the Bank be and the same is hereby rescinded as of the date of issuance. Judgment shall be entered accordingly.

### APPENDIX

February 19, 1976

Federal Deposit Insurance Corporation
345 Park Avenue
New York, New York 10022
Att: Mr. George Bilder
Assistant Regional Director

Gentlemen:

As required by banking law, we are reporting what we feel are fraudulent loans that were originally granted by this bank starting in July 1975. We have discovered this in an investigation which started on January 28 upon reviewing loans extended to Executive Investments, Inc., Transcontinental Industries, Inc., K & M Development Corp., and Louis Koval.

Hudson United Bank, sometime in early July, was approached by a Mr. Thomas R. Mullens requesting a loan for working capital for his corporation, Executive Investments, Inc. Mr. Mullens was accompanied by a Mr. Marvin Kolsky. Mr. Mullens discussed this loan with our bank officers, Mr. Charles Dadas, vice-president, and Mr. Robert Lee Potter, vice-president and loan officer. He supplied information to these officers on financial statements purported to be prepared by A. Rosato and Company, a CPA firm in Morristown, New Jersey. He also indicated, as per Mr. Potter's remarks, that the reason for his desire to borrow these funds at Hudson United was that his bank, Fidelity Union Trust Company, N.A. in Morristown, took too long to clear deposited items and that, if this bank would clear the items in three days, he would be delighted to do business with Hudson United Bank. The statements were presented to these officers along with a copy of an estimated tax return and a copy of a check issued to the IRS for $691,000—purportedly for payment due to IRS. This check was drawn on the Fidelity Union Trust Company, N.A., in Morristown.

He also purported that there were a number of land deals pending for considerable amounts of money to become due his corporation and left letters of information concerning contracts and two copies of contracts purported to be signed by Allied Stores Corporation and International House of Pancakes. Also provided were personal financial statements on Thomas R. Mullens and Carmen Mullens and Mr. Marvin Kolsky and Barbara Kolsky.

With this information and purported credit checkings done by our credit department, the Board of Directors of Hudson United Bank approved this loan on July 22, 1975. On July 24, 1975 a note was prepared in the amount of $600,000 and the term of the note was drawn for one year from date with interest payable monthly at 11.5%. The loan was to be secured by mortgages on personal properties of Mr. and Mrs. Mullens located on Beaver Ridge Road in Morris Plains and Bernardsville Road in Mendham, New Jersey. Mr. and Mrs. Kolsky offered and secured this note with a mortgage on their residence at Nine Tower Lane in Morristown, New Jersey.

The other condition to the loan was that from the proceeds of the $600,000, a $300,000 C/D would be issued and in turn pledged as additional security to this $600,000 loan. The balance of $300,000 was deposited into a new account of Executive Investments, Inc. This loan was also accompanied by the separate Guarantee Instrument of Thomas R. Mullens and Carmen Mullens and a separate guarantee of Marvin A. and Barbara Kolsky. It was also cross-guaranteed by two other corporations purportedly owned by Mullens, which are Carnelian Contracting Company, Inc. and TEM Associates, Inc.

On July 28 Mr. Mullens requested a $50,000 loan to Transcontinental Industries and that loan was granted and extended by our loan officer with a guarantee by Mullens and his wife and cross-guaranteed by the following Mullens corporations: Executive Investments, Inc., TEM Associates, Inc. and Carnelian Contracting Company, Inc.

On July 30 Mr. Mullens again returned to the bank and requested a loan for $50,000 to K & M Development Corp. with the personal guarantee of Thomas and Carmen Mullens and cross-guaranteed by Transcontinental Industries, Executive Investments and TEM Associates. This loan was granted by our senior commercial loan officer and check issued on August 1, 1975.

Information in our credit file and additional information supplied by our senior vice-president John Clark, indicated that the loans that were extended to these corporations had to be thoroughly investigated. After discussion on Wednesday, January 28, with the commercial loan officers concerning the documentation of these loans, I proceeded on the following day, Thursday the 29th, to verify information with the Fidelity Union Trust Company, N.A. of Morristown, New Jersey, which was the bank reference given by Executive Investments, Inc. Mr. Noel Peters, President of that bank, informed me that he had called an officer of the Hudson United Bank, name unknown, to warn against the problem of clearance of checks between the two banks in August 1975. I questioned whether Fidelity Union Trust Company, N.A. had extended credit to Executive Investments, Inc. and he indicated in conversation that they had not, but they did extend a first mortgage on a land development plot in Morris County to TEM Associates, a related corporation to Executive Investments, Inc., on which there is a balance due of approximately $285,000 which is participated with their affiliated bank Fidelity Union Trust Company, Newark, New Jersey.

He indicated further that there were a number of pending liens and judgments supposedly started against Executive Investments and other related corporations.

He also indicated that he had knowledge of a warrant for the arrest of Mr. Mullens, President of Executive Investments, for the issuance of a bad check of a sizeable amount to an air-conditioning contractor in the Mendham area. I asked Mr. Peters if he knew of any other banks that were involved, and he indicated that the Bernard State Bank of Bernardsville, New Jersey had called him requesting information and that they were involved with loans to Mullens and Executive Investments, Inc.

He further stated that the offices of Executive Investments, Inc., which were in his bank building, were locked since last Friday and that he had spoken to Mrs. Mullens directly and she indicated that she did not know where her husband was and that some individuals had strong-armed her to obtain information as to the whereabouts of her husband, Mr. Thomas Mullens. I asked Mr. Peters did his records indicate as to whether we had ever called to check his bank for credit references before July 24? He indicated that his inquiry sheets on this showed no record of inquiry but that did not mean that we did not inquire. He did state, however, that the only loan made to any of the Mullens corporations was to TEM Associates on the land development mortgage.

In discussing some of the items that had cleared through his bank, he made note of a photostat of a deposit that he had made on Executive Investments, Inc. account and that it was an official bank check # 117062 issued by Hudson United Bank, dated December 31, 1975, payable to Louis Koval and endorsed by Koval and deposited into Executive Investments' account. I asked Mr. Peters if a check drawn on his bank in the total amount of $691,000 payable to IRS was ever presented for payment? He stated that the largest collectable balance that his records indicated was a collectable balance of $46,000.

He also indicated that on his records Marvin Kolsky was removed as an officer on the Corporate Resolution of April 1, 1975. Mr. Kolsky on our records indicated that he was a vice-president on July 24, 1975.

After finishing this phone interview with Mr. Noel Peters of Fidelity Bank, I discussed and recommended to Mr. Arthur Dickson, Chairman of the Board of Hudson United Bank, that we mature and demand payment on our $600,000 loan to Executive Investments, Inc. and that we demand full payment for the two notes then presently past due of K & M Development Corp. and Transcontinental Industries. We applied the pledged $300,000 C/D with accrued interest against the note of Executive Investments to reduce the balance to $293,009.59 plus accrued interest to that date of $18,-783.33. These demand letters were sent to all corporate makers, corporate guarantors, personal guarantors and endorsers on Friday, January 30.

On February 3, in continuing the investigation on the loans, I attempted to call the CPA firm on whose letterhead and signature the statements of all Mullens' corporations were made and found that there was no phone listing for A. Rosato and Company, CPA's at Ten Park Place, Morristown, New Jersey. In order to clarify the existence of this CPA firm I called Touche Ross, which is a CPA firm employed by our bank, and asked if they would check if such a CPA firm existed. On recall to me, they stated that they had checked and found that A. Rosato and Company is not a listed member of any CPA association in New Jersey and that there was no CPA firm certificate issued to the firm of A. Rosato and Company or A. Rosato.

They indicated that there was an "A. Rosato" listed in the directory in the Morris Plains area but did not know whether he was an accountant. I proceeded to call the phone number listed in the Morris Plains directory of an A. Rosato and was informed by a Mrs. Rosato that her husband does not have a CPA firm but he is employed by Touche Ross in New York City. I called his business phone in the Touche Ross office in New York City, and Mr. Rosato informed me that he had hired an attorney by the name of Margolis, who is a member of the law firm of Young, Rose and Milpaw in Newark, and that Mr. Margolis had notified the U. S. Attorney's office in Newark,

Fraud Division, that Mr. Mullens has been using Mr. Rosato's name in connection with a non-existent CPA firm.

A few minutes after the call to Mr. Rosato, Mr. Margolis called my office and indicated that he was representing Rosato and that he had informed the U. S. Attorney's office regarding Mullens' use of Rosato's name as a CPA firm. He also indicated to me that Mr. Rosato and his family knew Mullens and that Mr. Rosato was an investor in Executive Investments, Inc.

On February 4, I received a call at 11:45 a. m. from Mrs. Leslie Kurtz of the U. S. Attorney's office stating that Mr. Margolis had called her concerning Rosato and she asked for information concerning our loans to Thomas Mullens and his corporations.

On February 4 at 1:30 p. m., I telephoned Mr. George Bilder, Assistant Regional Director of the FDIC, New York City, and then Mr. Richard Cook of the New Jersey Department of Banking informing them of the facts regarding our loans.

We then notified the FBI, Mr. John Schwartz in the Newark office, and Mr. George McLaughlin of the Hudson County Prosecutor's office in Jersey City.

On February 5, we received a copy of the *Morristown Daily Record* dated February 4 stating that a Thomas R. Mullens of Mendham, New Jersey, head of K & M Development Corp. and a counseling business in Morristown, was being queried on a $7 million fraud plot.

On investigating the Louis Koval loan of 11 Phyllis Road, Mount Freedom, New Jersey, which was granted by our loan officers on December 31, 1975 in the amount of $50,000 with terms of 60 days to become due and payable by March 1, 1976, we found that the check which was used for the proceeds of the loan was deposited and purportedly endorsed by Louis Koval to the account of Executive Investments, Inc. at the Fidelity Union Trust Company, N.A. in Morristown, New Jersey. This confirmed the information supplied by Mr. Noel Peters, President of that bank.

On February 3, I telephoned Mr. Koval and, in our phone conversation, he stated that he did not borrow nor did he ever borrow any funds from our bank nor was he ever in Hudson United Bank and did not speak to any officer concerning a loan for himself personally nor for his corporation, the Randolph Hills Tennis Club, Inc. He did state, however, that Mr. Mullens, with whom he has invested in Executive Investments, Inc., offered his (Mullens') assistance to refinance his mortgages on his corporate property, possibly with another bank. Mr. Koval agreed to come to our offices on February 9 and sign an Affidavit of Forgery concerning this loan.

On February 9 Mr. Koval appeared before our bank attorney Mr. George Moser, Mr. Arthur Dickson, Chairman of the Board, and myself and stated that the note presented to him was his signature but that the signature on the check issued for the proceeds of this note was not his signature. It was agreed with Mr. Koval that we would forward an affidavit of these facts for his signature to his attorney, Mr. Herbert Strulowitz, Two East Blackwell Street, Dover, New Jersey. We are presently waiting for the signed affidavits from Mr. Koval and his attorney, Mr. Strulowitz.

As of this writing, these are all the pertinent facts regarding these fraudulent loans. Although we do not have any knowledge at this time of any wrongdoings by any of the officers of Hudson United Bank, we are forwarding a copy of this letter to our insurance carrier. If we have further information regarding these fraudulent loans, we will notify you immediately.

Very truly yours,

s/ Joseph L. Robertson