**FIDELITY & DEPOSIT COMPANY OF MARYLAND, a Corporation of the State of Maryland**

v.

**HUDSON UNITED BANK, a Banking Corporation of the State of New Jersey, Appellant.**

No. 80–2234.

United States Court of Appeals, Third Circuit.

Argued March 17, 1981.

Decided June 30, 1981.

Rehearing and Rehearing En Banc Denied Aug. 6, 1981.

Murry D. Brochin (argued), Roger A. Lowenstein, Lee Hilles Wertheim, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N. J., for appellant.

Charles H. Hoens, Jr. (argued), Roger P. Sauer, Lum, Biunno & Thompkins, Newark, N. J., for appellee.

Thomas C. Jamieson, Jr., Michael F. Spicer, Douglas G. Sanborn, Jamieson, McCardell, Moore, Peskin & Spicer, Trenton, N. J., for amicus curiae, New Jersey Bankers Assn.

Before SEITZ, Chief Judge, and VAN DUSEN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Hudson United Bank (the Bank) appeals from a final order of the district court entering judgment of rescission for Fidelity & Deposit Company of Maryland (F&D) after a trial to the court. Disposition of this complex and difficult diversity action is governed by New Jersey law.

### I.

In this action, F&D seeks to rescind *ab initio* a fidelity bond it issued to the Bank on March 21, 1976. This bond insured the Bank against losses from many causes, including employee dishonesty, but it did not

cover losses from borrower fraud or dishonesty. Prior to March 21, 1976, the Bank was insured under a fidelity bond issued by Employers Mutual Liability Insurance (Employers). The F&D bond, as well as the Employers bond, was a discovery bond: it covered losses discovered during the effective period of the bond regardless of when they were sustained.[1]

In early 1974, the Bank hired Mr. Potter as a senior loan officer in its commercial loan department. He was made a vice president in September of that year. In July 1975, on Potter's recommendation to the Board of Directors, the Bank made loans eventually totaling $700,000 to companies owned and controlled by Mr. Mullens (Mullens loans).[2]

In January 1976, Mr. Robertson was appointed President of the Bank. In early January, some senior loan officers told him that they questioned Potter's competence. Robertson testified that after reviewing the loan files, including the Executive Investments file, he concluded that Potter was indeed incompetent. He noted that the documentation in the Executive Investments file was poor and that the loan should not have been granted based on such documentation. He also discovered that certain financial statements had been incorrectly totaled and contained penciled corrections. However, he testified that because the loan was substantially collateralized by a $300,000 Certificate of Deposit (C.D.) and by what appeared to be valuable mortgages, he did not think at the time that the loan itself was necessarily a bad risk.

Soon after this review, Robertson began an extensive investigation of the Executive Investments file. He found that there was a warrant out for Mullens' arrest for issuing bad checks, that Mullens' references did not think highly of him, that Mullens was being investigated in a seven-million-dollar fraud scheme, and that there were several judgments and liens pending against him. When Robertson attempted to verify the financial statements contained in the Executive Investments file, he also discovered that the Certified Public Accounting firm, "A. Rosato & Co.," which had certified the financial statements, did not exist.[3]

Finally, Robertson discovered that Potter and another loan officer had allowed some corporate checks to be cashed by the individual authorized to sign checks for the corporation. This is not in accordance with general banking practice.

Robertson suggested to the Chairman of the Bank's Board of Directors that the Bank mature and demand payment on the Mullens loans. The Bank applied the pledged $300,000 C.D. with accrued interest to the Executive Investments note, reducing its balance to $239,009.59 plus $18,783.33 in accrued interest.

On February 4, Robertson called the Regional Director of the FDIC in New York and the New Jersey Department of Banking to inform them of the loan losses. He also notified the FBI, the United States Attorney, and the State prosecutor of Mullens' actions.

On February 10, at the Board of Directors meeting, Robertson recommended that the Bank discharge Potter. Robertson has consistently maintained that this action was taken because he believed that Potter was incompetent. He based this belief upon the condition of the Executive Investments files as well as Potter's other loan files, the staffing of Potter's department, and the unprofessional appearance and

---

1. Although the parties agree that the bond covered losses discovered during the effective period of the bond, they disagree over the district court's characterization of the bond as a claims-made bond. We will not discuss the propriety of this characterization because we believe that the district court correctly described the bond as covering losses sustained at any time, provided the losses were *discovered* during the bond period.

2. $600,000 was loaned to the Mullens-controlled Executive Investments Company, and two $50,000 loans were made in exchange for notes from other Mullens-controlled companies.

3. Mr. Rosato, an accountant, was suing Mullens for the use of his name.

manners of Potter himself.[4] On February 19, Robertson sent a letter to the FDIC outlining the events surrounding the Mullens loans. At the close of this letter, Robertson stated:

> As of this writing, these are all the pertinent facts regarding these fraudulent loans. *Although we do not have any knowledge at this time of any wrongdoings by any of the officers of Hudson United Bank, we are forwarding a copy of this letter to our insurance carrier.* If we have further information regarding these fraudulent loans, we will notify you immediately.

(Emphasis added).

About the same time, the "Mullens swindle," which also involved other banks, had received widespread publicity throughout New Jersey. On February 20, the Chairman of the Board issued a press release stating that the "limit of Hudson United Bank's exposure is $400,000, which is partly secured by real estate mortgages." The following week a copy of the FDIC letter was forwarded to Employers along with a covering letter which stated:

> *We believe that we are excluded from coverage* under the exclusion section of our blanket bond policy [excluding losses not due to employee dishonesty or forgery], however, we wish that you would review the contents of this letter and inform us in writing as to whether we

have a claim or [under] what conditions would this claim be allowable.

(Emphasis added).[5] The Bank also sent a letter informing its shareholders that the Bank was increasing its reserve for bad debts so it could write off losses. It explained the Mullens exposure of $400,000 as well as some REIT losses and a large loan write-off of $2,000,000.

During this time, the Bank had been receiving bids for fidelity insurance from carriers other than Employers. An application for insurance with F&D had been completed and returned in January 1976. On March 12, Mr. Dovico, the Bank's comptroller in charge of obtaining insurance, informed Mr. Hay, the F&D representative, of a "possible pending fraud claim" that had been reported to Employers. Later that day, Hay wrote the Bank a letter confirming this telephone conversation. In this letter, Hay stated: "[Y]ou mentioned the fact that there was a possible pending fraud on which you have notified your present insurance carrier. Since the premiums quoted by our agent, Mr. Irwin, are based on a no loss experience, I would appreciate a letter from you regarding the possible fraud and the facts surrounding the same." No reply was received by F&D.[6] Nevertheless, when Employers decided not to renew its bond with the Bank, F&D issued a policy effective March 21.[7]

In November 1976 the Bank filed with both Employers and F&D proofs of loss

---

4. The district court made no findings of fact that contradict Robertson's characterization of the reasons for Potter's discharge. To the extent that F&D contends that Potter was discharged for "suspected dishonesty," it must be relying on the answer to one interrogatory in connection with the Employers litigation. We will address this contention when we discuss the effect of the Employers litigation *infra.* Further, as far as we can tell, it has never been proved that Potter acted dishonestly. Nothing we say in this opinion should be interpreted as establishing his alleged dishonesty.

5. An Employers representative came to the Bank in mid March to look into the claim, and he sent a letter to the Bank sometime after the effective date of the F&D bond stating that the Bank had no claim under the policy.

6. Although Dovico testified that he mailed Hay a copy of the letter to the shareholders describing the Bank's losses, we cannot say that the district court's finding of fact that Hay never received it was clearly erroneous. *See* note 10, *infra.*

7. F&D's attempt to characterize Employers' decision not to renew coverage as one based on Potter's alleged dishonesty in connection with the Mullens loans has no basis in the record. Employers informed the Bank that it would not renew the bond until it had received the FDIC audit of the Bank's classified loan structure. We have no reason to believe that Employers declined to renew coverage for any reason other than the Bank's failure to obtain permission from the regulatory authorities to release this confidential document. The district court made no findings to the contrary.

covering the Mullens loans. In December 1977 the Bank filed suit against Employers for the Mullens-related losses, and it obtained a default judgment. However, this judgment was later vacated and the case eventually settled before trial. A stipulation of dismissal was entered. The loans that were the subject of the Employers settlement were withdrawn from the F&D claim.

On January 31, 1977, Hay informed the Bank that F&D was cancelling the bond effective April 2, 1977. Hay's letter indicated that the decision to cancel was based on the fact that the Bank had notified Employers of a potential loss prior to the effective date of the policy. On April 1, the Bank requested a thirty-day extension, but F&D granted only a seven-day extension. Subsequently, the Bank purchased from F&D an additional twelve-month rider, an option provided in the original bond.

During 1977 the Bank discovered many other losses unrelated to Mullens, some of which also involved Potter, and it filed proof-of-loss claims on these losses with F&D. On January 13, 1978, F&D attempted to rescind the bond *ab initio* and it tendered the premium payments to the Bank.. The Bank refused the tender, and F&D filed this action seeking rescission.

The district court found for F&D. In holding that F&D was entitled to rescission, the court relied on several grounds. It held that under New Jersey law, the doctrine of equitable fraud controlled the disposition of this case. *See Fidelity & Deposit Co. v. Hudson United Bank*, 493 F.Supp. 434, 440–42 (D.N.J.1980). Although it found no evidence of an intent to conceal information or to defraud F&D, the court reasoned that the Bank was under a duty to advise F&D of all

> information known to it prior to March 21 ... which is reasonably related to the risks to be covered. The failure to disclose such information is not excused by an honest belief that the losses or potential losses within the knowledge of the bank did not involve a risk which would be covered by the bond, if issued.

*Id.* at 440. The court also found that the Bank's conduct in the suit against Employers for the Mullens losses estopped it from recovering from F&D. *See id.* at 444. The court rejected the Bank's claim that F&D had waived whatever right it might have had to rescind by electing to cancel and by providing twelve months additional coverage. *See id.* at 446–48.

## II.

At the outset, we address the district court's reliance on the doctrine of equitable fraud. The court found that under New Jersey law, F&D did not have to prove that the Bank intended to conceal information or to submit false answers in its application for insurance because F&D could rescind the bond if the Bank had made innocent misrepresentations of material facts. The Bank contends that this was an erroneous interpretation of New Jersey law.

In New Jersey, the concept of equitable fraud developed primarily in response to attempts by life insurance companies to avoid coverage after an insured had died. When an insurance company could not prove "legal fraud," it could nevertheless rescind an insurance policy in equity on the ground that the insured had made innocent misrepresentations of material facts. *See, e. g., Metropolitan Life Insurance Co. v. Tarnowski*, 130 N.J.Eq. 1, 20 A.2d 421 (N.J. 1941).

The doctrine of equitable fraud, however, is not strictly applied to all representations by an insured. *See, e. g., Ettelson v. Metropolitan Life Insurance Co.*, 164 F.2d 660, 665 (3d Cir. 1947) (applying New Jersey law). In applying this doctrine, New Jersey courts have consistently distinguished between objective questions, the answers to which necessarily are within an applicant's knowledge, and subjective questions that seek to probe an applicant's state of mind. *See, e. g., Russ v. Metropolitan Life Insurance Co.*, 112 N.J.Super. 265, 270 A.2d 759 (Law Div. 1970). The doctrine of equitable fraud has been strictly applied to objective questions. However, with respect to sub-

jective questions, New Jersey courts hold that "if a negative answer is a correct statement of [the applicant's] knowledge and belief, it is not a misrepresentation, and thus does not constitute equitable fraud." *Formosa v. Equitable Life Assurance Society*, 166 N.J.Super. 8, 398 A.2d 1301, 1305 (App.Div.1979).

The F&D application filled out by the Bank contained a chart entitled "Six-year loss information," which sought the following information:

| Date of Loss | Amount of Loss | Amount Recovered from Insurance | Amount of Loss Pending | Amount Recovered from other than Insurance | Type of Loss |
|---|---|---|---|---|---|
| | | | | | |

The parties agree that the losses referred to in the above chart include only those losses that would be covered by the fidelity bond. The Bank typed across the blanks provided in this chart, "NO LOSSES PAID BY INSURANCE CARRIER DURING THE PAST SIX YEARS." This response indicates that the Bank interpreted the chart to be an objective request for information pertaining to all claims of losses actually filed with its previous insurance carriers. The F&D application also contained the following statement, which the Bank certified as true:

> The present officers and employees of the Insured, of whom a complete list at this time, with positions held, is given above, have, *to the best of the Insured's knowledge and belief*, while in the service of the Insured always performed their respective duties honestly. There has never come to its notice or knowledge any information which *in the judgment of the Insured* indicates that any of the said officers and employees are dishonest. Such knowledge as any officer signing for the Insured may now have in respect to his own personal acts or conduct, unknown to the Insured, is not imputable to the Insured.

(Emphasis added).

■ It is not claimed that either the Bank's response to the information requested in the chart or the certification of employee honesty was false when the Bank completed the F&D application. However, under New Jersey law, when events occur between the submission of an application for insurance and the effective date of the policy that cause information contained in the application to be untrue, the insured has an obligation to disclose this fact to the insurance company. *See, e. g., Weir v. City Title Insurance Co.*, 125 N.J.Super. 23, 308 A.2d 357 (App.Div.1973). Therefore, it is essential to determine whether the events that transpired between January 1976, when the application was completed, and March 21, 1976, when the policy was issued, triggered a duty on the part of the Bank to supplement the application.

■ We believe that the Bank's construction of the chart as requesting only information pertaining to covered losses that had actually been filed with the Bank's insurance carriers over the previous six years is reasonable.[8] Under this construction, the chart constitutes an objective request for information. Consequently, under New Jersey law the doctrine of equita-

**8.** To the extent that F&D argues for a contrary construction, we note that acceptance of such an argument would demonstrate at best only that the chart is reasonably susceptible of two different interpretations. It is a settled principle of insurance law that all ambiguities must be resolved against the insurer and in favor of coverage. *See, e. g., Reese Cadillac Corp. v. Glens Falls Ins. Co.*, 59 N.J.Super. 118, 157 A.2d 331, 335 (App.Div.1960). This principle applies to fidelity bonds issued to banks. *See Midland Bank & Trust Co. v. Fidelity & Deposit of Md.*, 442 F.Supp. 960, 969 (D.N.J.1977); *Nat'l Newark & Essex Bank v. Am. Ins. Co.*, 76 N.J. 64, 76, 385 A.2d 1216, 1222 (1978). Therefore, we believe that the Bank's construction of the chart should control for purposes of determining the extent to which the doctrine of equitable fraud applies in this case.

ble fraud should be strictly applied. However, because the Bank did not file a proof of loss with Employers until approximately eight months after the effective date of the F&D bond, we do not believe that the events that occurred before the effective date of the bond caused the Bank's initial response to be untrue. Therefore, the bond cannot be rescinded on the ground that the Bank failed to supplement the information it supplied in the chart.[9]

■ The certification of employee honesty requested subjective information—the Bank's best "knowledge and belief" that its employees performed their duties honestly. With respect to subjective questions, New Jersey law provides that an insurer must demonstrate not only that an answer was false, but also that the insured knew that it was false. *See Russ v. Metropolitan Life Insurance Co.*, 112 N.J.Super. 265, 270 A.2d 759, 763 (Law Div. 1970). With regard to this certification, we believe that the district court incorrectly applied New Jersey law when it held that the doctrine of equitable fraud should be strictly applied against the Bank.

■ The district court did not hold that the Bank had actual knowledge before the effective date of the F&D bond that one of its employees had acted dishonestly.[10] It found that the Bank acted "under the honest belief that the [Mullens] losses were not covered by its existing bond," 493 F.Supp. at 440, and that "[t]here is no evidence of a conscious intention to conceal." *Id.* We do not believe that these findings are clearly

erroneous. As a result, F&D is not entitled to rescission under an appropriate application of the doctrine of equitable fraud to the Bank's certification of employee honesty.

### III.

We have upheld the district court's findings that the Bank did not consciously intend to defraud F&D and that the Bank had no actual knowledge of Potter's alleged dishonesty before the effective date of the F&D bond. Therefore, F&D is entitled to rescind only if the Bank can be charged as a matter of law with having had sufficient constructive knowledge of Potter's alleged dishonesty before the effective date of the bond to impose upon it a duty to notify F&D. The district court found that the Bank had knowledge of the following facts before the effective date of the F&D bond:

1. The facts as set forth in the F.D. I.C. letter including the fact that Mullens had defrauded the Bank in connection with certain loans;

2. That corporate checks of Executive Investments ... were being cashed and approved by Potter whose explanation for cashing said checks was unsatisfactory;

3. That the structure of the loans to Executive Investments was improper;

4. That there were inconsistencies between Potter's recommendation to the board of directors regarding the loans and the documentation allegedly supporting said loans as contained in the relevant files;

9. Alternatively, if the chart was construed to request information pertaining to covered losses not yet filed with an insurance carrier, it would be more appropriately characterized as a subjective request similar to the certification of employee honesty discussed *infra*. Losses would be covered by a fidelity bond only if the result of employee dishonesty, not borrower fraud. Therefore, a request for information about unfiled but covered losses would be subjective because the Bank would have to have believed that employee dishonesty was involved before it would be required to include the Mullens losses in the chart.

10. Although the district court stated that "some evidence exists of actual knowledge." 493 F.Supp. at 442, the "evidence" to which it referred was the conduct of the Bank in connection with the Employers litigation. We believe that this statement did not constitute a finding of actual knowledge, but was part of the district court's subsequent discussion of estoppel and admissions in connection with the Employers' litigation. Were we to find otherwise, we would be attributing to the district court totally inconsistent findings of facts— that the Bank had an honest belief the losses were not covered and had no intent to conceal information, yet that the Bank also had actual knowledge of employee dishonesty.

5. That the accounting statements upon which the Mullens' loans were predicated were fictitious and the [accounting firm] nonexistent;

6. That said financial statements contained pencilled changes;

7. That Employers, which had refused to renew its bond, had been advised of the Mullens' losses by the Bank and had received a copy of the F.D.I.C. letter; and

8. That, based upon his testimony, Mr. Robertson, as President of the Bank, would not have granted the Mullens' loans and would have disclosed to F&D the knowledge the Bank possessed at that time concerning said loans.

We must determine whether this degree of knowledge is sufficient as a matter of law to charge the Bank with knowledge of Potter's alleged dishonesty and to impose upon it a duty to disclose this information to F&D as part of its application for insurance.

■■ In making this determination, we are aided by the many cases that have defined when a bank "discovers" a loss for purposes of filing a notice of loss with its insurance carrier. In this context, courts have consistently defined "discovery" as occurring when a bank has sufficient knowledge of specific dishonest acts to justify a careful and prudent person in charging another with dishonesty or fraud. A bank is not under a duty to notify its insurance carrier until it has knowledge of some specific fraudulent act. Mere suspicion of dishonesty or wrongdoing is not enough. *See, e. g., American Surety Co. v. Pauly*, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898); *Wachovia Bank & Trust Co. v. Manufacturers Casualty Insurance Co.*, 171 F.Supp. 369 (M.D.N.C.1959). In discussing this standard, the New Jersey Supreme Court recognized that the conclusion that a trusted employee has been dishonest does not come easily to an employer:

"Discrepancies or irregularities, confirmatory in themselves of guilt are often explainable, or turn out to be entirely consistent with innocence. The confidence of years is not ordinarily shattered in an instant, and the employer may be commendably slow to be convinced of the depravity of the person whom he has implicitly trusted. Unjust inferences and false accusations are always to be avoided. The truth, only after being ascertained with reasonable certainty, can be safely made known. Character is too sacred to permit tolerating of a less liberal rule."

*National Newark & Essex Bank v. American Insurance Co.*, 76 N.J. 64, 80–81, 385 A.2d 1216, 1224 (1978) (quoting *Perpetual Building & Loan Association v. United States Fidelity & Guaranty Co.*, 118 Iowa 729, 92 N.W. 686, 688 (1902)). We recognize that this standard applies to determinations whether an insured should have filed a notice of loss, and that it might not be the standard applied by the New Jersey Supreme Court to determine whether an entire insurance contract may be rescinded. However, rescission is a drastic remedy, and ordinarily an insurance company must show that the insured actually knew that its answers were false and that it intended to mislead the insurer. Therefore, we believe that in a rescission case the New Jersey Supreme Court would apply a standard at least as favorable to the insured as the one discussed above.

In *United States Fidelity & Guaranty Co. v. Empire State Bank*, 448 F.2d 360 (8th Cir. 1971), the United States Court of Appeals for the Eighth Circuit was presented with a factual situation similar to the one in this case. The events leading to the discovery of employee dishonesty in that case occurred over a period when the bank was covered by two successive bonds issued by different insurance companies. Before the effective date of the second bond, Empire State Bank became aware of a borrower's fraud and the officer in charge of the worthless loan had resigned. Moreover, the borrower had informed bank officials that he had "paid off" the bank officer. The Eighth Circuit, relying on the well-established standards relevant to discovery, reasoned that this knowledge did not consti-

tute discovery. The court emphasized that "[d]iscovery ... imports an awareness of the *significance* of known facts. In determining when discovery has taken place, the trier of fact must find the pertinent underlying facts known to the insured and must further determine subjective conclusions reasonably drawn therefrom." *Id.* at 364. *See also Midland Bank & Trust Co. v. Fidelity & Deposit of Maryland*, 442 F.Supp. 960, 969 (D.N.J.1977) (applying same reasoning to reject claim that discovery had occurred before effective date of bond; rescission not in issue). In *Empire State Bank*, the bank had completed an application form similar to the one in this case. The court reasoned that:

> The application form required the applicant Bank to report all losses during the previous five-year period and to disclose pertinent information known to the applicant concerning present employees. In the absence of any showing of bad faith or fraud, however, applicant insurer makes no case for setting aside coverage on the basis of false representation.

448 F.2d at 366.

 The district court in this case did not adopt the standard traditionally used to determine whether a bank has discovered a loss. It apparently found that this standard was inapplicable because the Bank had supplied Employers with a copy of the letter it had sent to the FDIC. *See* 493 F.Supp. at 440 n.3. We find this distinction unpersuasive. The FDIC letter detailed Mullens' actions and the Bank's belief that the losses were due to borrower fraud not covered by the fidelity bond. Robertson testified that as a routine matter of courtesy the Bank informs its bonding company of major loan losses that affect its reserve regardless of whether the Bank believes that such losses are covered. In the letter sent to both the FDIC and to Employers, the Bank expressly disclaimed any knowledge of employee dishonesty. Although a letter disclaiming coverage may toll the running of a bond's limitation period, *see National Newark & Essex Bank*, 76 N.J. at 83, 385 A.2d at 1225, we do not believe that it properly can be deemed to be discovery of a *covered* loss. In *National Newark & Essex Bank*, the New Jersey Supreme Court distinguished between a notice of loss sufficient to toll a bond's limitation period and a proof of loss. We believe that it is inappropriate to order the drastic remedy of rescission on the ground that the Bank, as a matter of courtesy, informed its former insurance carrier of a loss it thought was not covered.

 Furthermore, it is undisputed that the Bank told Hay that it had informed Employers of a·"possible pending fraud" claim that it did not believe was covered under the bond. If F&D believed that it needed more information concerning this loss, which the Bank believed involved only borrower fraud, it bore the burden of requesting supplemental information from the bank. *See Soloman v. Continental Insurance Co.*, 122 N.J.Super. 125, 299 A.2d 413, 418 (App.Div.1972).[11]

 The district court did not find that the Bank could be charged with discovering the loss under the well-established rule of discovery embraced by the New Jersey Supreme Court in *National Newark & Essex Bank*, 76 N.J. 64, 385 A.2d 1216. Instead, based on its findings of fact as to the Bank's knowledge, it concluded that the

---

11. Hay requested further information and the district court found that he never received a copy of the Bank's letter to its shareholders, which Dovico testified he sent to Hay. However, F&D did not pursue its request for such information, and it did not delay the effective date of the bond pending receipt of this information. Moreover, Hay never relayed his conversation with Dovico to F&D's Baltimore office, which is responsible for underwriting decisions. Assuming that Hay's request properly can be deemed a modification of the application, New Jersey law provides that when an insurance company issues a policy on an application that contains unanswered or incompletely answered questions, that policy cannot be rescinded on the grounds of concealment or the incompleteness of answers "in the absence of clear proof of a fraudulent or intentional suppression of a fact." *Goldstein v. Metropolitan Cas. Ins. Co.*, 14 N.J.Super. 214, 81 A.2d 797, 799 (App.Div.1951). There is no indication of fraudulent or intentional misconduct in this case.

circumstances surrounding the Mullens losses "presented serious symptoms which were not then susceptible of any final diagnosis. It was too early to rule out the possibility of employee dishonesty, and as the facts subsequently developed, the losses were due in part to such employee dishonesty." 493 F.Supp. at 440. We believe that the district court committed legal error in applying this standard. The New Jersey Supreme Court has recognized that mere suspicion of dishonesty or wrongdoing is not sufficient "discovery" to absolve an insurance company of its obligation to cover a particular loss on the ground that an insured failed to file a notice of loss within the time prescribed in the bond. *See id.* We do not believe that the New Jersey Supreme Court would apply a standard less favorable to the insured in determining whether an insurance company is entitled to the more drastic remedy of rescission. Further, we conclude as a matter of law that the relevant findings of fact made by the district court with respect to the knowledge of the Bank before March 21, 1976 do not support a conclusion that the Bank had sufficient knowledge of employee dishonesty to impose upon it a duty to notify F&D in its application for insurance.

## IV.

The district court also held that because of the position the Bank took in the Employers litigation, it was estopped from asserting in this proceeding that it did not discover Potter's alleged dishonesty until after the effective date of the F&D bond. Because the parties to the Employers litigation settled before trial and terminated that litigation with a stipulation of dismissal, the district court did not rely on estoppel by judgment. Moreover, because the Bank has dropped the Mullens losses from its claim against F&D, we are not concerned with estopping one party from receiving double recovery for the same losses.

In reaching its decision, the district court noted that under New Jersey law a party may argue inconsistent legal theories, but it may not play fast and loose with the courts by adopting a set of facts diametrically opposed to one it previously adopted. *See, e. g., In re Perrone's Estate,* 5 N.J. 514, 76 A.2d 518, 524 (1950); *Tabloid Lithographers, Inc. v. Israel,* 87 N.J.Super. 358, 209 A.2d 364 (Law Div. 1965). In our review of the district court's conclusion that the Bank has violated this rule, we are somewhat handicapped because the district court never delineated the part of the Employers litigation that estopped the Bank from arguing that it did not discover Potter's alleged involvement until after the effective date of the F&D bond.[12]

On appeal, F&D attempts to characterize the question of when the Bank discovered Potter's alleged dishonesty as a simple question of fact solely within the knowledge of the Bank. As a result, merely filing a complaint against Employers could be said to estop the Bank from taking the position with respect to discovery that it takes in this case. However, in *National Newark & Essex Bank v. American Insurance Co.,* 76 N.J. 64, 385 A.2d 1216, 1224 (1978), the New Jersey Supreme Court recognized that "serious difficulties inhere in pinpointing the exact time of discovery of a loss" under a fidelity bond as compared with a loss under a fire insurance policy. Moreover, in most cases involving fidelity coverage, a bank discovers a loss, such as a defaulted loan, long before it discovers that employee dishonesty is involved. If the discovery process spans two bond periods, it appears to be common practice to file suit against both carriers. *See United States Fidelity & Guaranty Co. v. Empire State Bank,* 448 F.2d 360, 366 (8th Cir. 1971). We do not accept F&D's characterization because we believe it is inconsistent with *National Newark & Essex Bank,* 76 N.J. 64, 385 A.2d 1216. Furthermore, accepting F&D's characterization would impermissibly extend the

---

12. The district court expressly disclaimed reliance on either the pleadings filed in the Employers litigation or the fact that the Bank accepted a settlement from Employers covering the Mullens losses. We believe the district court was correct in not relying on either of these grounds.

rule discussed in *In re Perrone's Estate*, 5 N.J. 514, 76 A.2d 518, to prohibit the practice of duplicate lawsuits when an insured is unsure which carrier's bond covers its loss.

We have reviewed the materials submitted by the Bank in the Employers litigation. The facts regarding the Mullens losses set forth in the Employers pleadings are not inconsistent with those pleaded and brought forth in this litigation. To the contrary, the facts alleged are virtually identical. With respect to when the Bank discovered employee dishonesty, the Employers pleadings only specify that "with regard to the above loans, plaintiff has complied with all conditions precedent." Furthermore, at the hearing on vacating the default judgment that had been entered against Employers, the Bank's counsel commented on the possible inconsistency of filing against both F&D and Employers for the same losses:

> [T]here is an overlap in the sense that because the question of discovery is one of law, really, after the facts have been heard, in order to be conservative, the bank filed a proof of loss as to both companies. . . . The knowledge of the bank as to employee dishonesty began with the date of the loss and became more and more concrete thereafter. . . . [T]he knowledge of the loss occurred, as related to employee dishonesty, either before March 21, 1976, or shortly thereafter.

We believe that this statement is not inconsistent with the Bank's position in this lawsuit that discovery occurred after the effective date of the F&D bond.

We can find only one factual matter attributable to the Bank that can properly be characterized as being inconsistent with its factual assertions in the present suit. In response to an interrogatory directed to the Bank in the Employers litigation, the vice president and secretary of the Bank, Mr. Schroeder, stated that "Mr. Potter was terminated on February 10, because of suspected dishonesty in connection with the Mullens group of loans." However, Schroeder was not personally involved in the decision to discharge Potter. At the time the

Bank answered the Employers interrogatories Robertson, who had been personally involved in the decision, was no longer with the Bank. In a deposition prepared for the Employers litigation, Robertson asserted that Potter was discharged for incompetency. This is consistent with his testimony in this case.

■ Schroeder's answer to the interrogatory qualifies as an admission of the Bank and was therefore properly admitted into evidence during the F&D trial. *See Bauman v. Royal Indemnity Co.*, 36 N.J. 12, 18, 174 A.2d 585, 588 (1961). We note that we are not concerned here with a "judicial admission," which involves a concession on the part of one party that a proposition of fact alleged by an opposing party is true, *see* 4 Wigmore, Evidence § 1058 (Chadbourn ed. 1972), and which is binding in the action in which it is made. *See Glick v. White Motor Co.*, 458 F.2d 1287 (3d Cir. 1972). Instead, we are concerned with a statement made by the Bank in connection with other litigation that is adverse to, or inconsistent with, its position in this case. As such, the answer to the interrogatory, although not conclusive, is admissible as evidence against the Bank to be weighed with all the other evidence by the trier of fact. *See, e. g., Bauman*, 36 N.J. at 18, 174 A.2d at 588; *Stoelting v. Hauck*, 32 N.J. 87, 159 A.2d 385 (1960). The answer to the interrogatory was admitted into evidence and considered by the district court in the F&D trial. The Bank does not argue that admitting the interrogatory answer was error; it argues that the district court misinterpreted New Jersey law to the extent it further used this interrogatory to hold that the Bank was estopped from claiming that it did not discover employee dishonesty until after the effective date of the F&D bond. We agree.

■ The Bank's position with respect to the reason for Potter's discharge was not frozen with Schroeder's answer to the Employers interrogatory. Had the Employers litigation not been settled, the Bank might have amended the answer to the interrogatory to conform to Robertson's deposition testimony concerning the reason for Pot-

ter's discharge, or testimony at trial might have enabled the trier of fact to resolve the differing reasons given for the discharge. The rule discussed in *In re Perrone's Estate*, 5 N.J. 514, 76 A.2d 518, would not have precluded amendment or additional testimony. *Cf. Tabloid Lithographers*, 87 N.J.Super. 358, 209 A.2d at 368–69 (party need not elect factual premise for recovery until judgment). The facts that the Employers litigation did not proceed to trial, and that the Bank was therefore not required to address these conflicting answers, should not now preclude the Bank from asserting in this action that Robertson's recollection of the reason for Potter's discharge is more accurate than its answer to the Employers interrogatory. Therefore, to the extent the district court used the answer to the interrogatory to estop the Bank from asserting nondiscovery of Potter's alleged dishonesty before the effective date of the F&D bond, we believe that it erroneously interpreted New Jersey law.

Our review of the Employers material reveals no other inconsistent factual assertions made by the Bank, and the parties have brought none to our attention.[13] The proceedings in the Employers litigation concentrated on whether Employers, in its motion to vacate the default judgment, had presented a meritorious defense by asserting that the Bank had failed to demonstrate employee dishonesty, and not on when the alleged dishonesty was discovered. To the extent the Bank relied on the same facts in both the Employers proceeding and the F&D trial to support its allegations of Potter's dishonesty, we believe that it was entitled to do so in order to obtain court determination of when it "discovered" the loss for purposes of deciding which insurance carrier should cover the losses. We believe that much of the district court's discussion of the effect of the Employers litigation would have been more appropriate if the Bank was attempting to recover from F&D for the same claims that it had recovered from Employers. However, we do not believe that the Bank's conduct in the Employers litigation warrants estopping it from defending a suit for rescission on the ground that it had no actual knowledge of Potter's alleged dishonesty before the effective date of the F&D bond. Therefore, we conclude that the district court committed legal error in holding that the Bank's conduct in the Employers litigation estopped it from asserting in this case that it did not discover employee dishonesty before the effective date of the F&D bond.

V.

The Bank also argues that F&D's election in January 1977 to cancel the bond and its decision to provide the Bank with an additional twelve-month rider constituted either a waiver of whatever right F&D might have had to rescind the bond or an affirmance of its obligation under the bond. However, because we have decided that F&D was not entitled to rescission, we need not address this contention.

VI.

We conclude that the district court incorrectly interpreted New Jersey law when it held that F&D was entitled to rescission under the doctrine of equitable fraud. Further, we conclude that the Bank was under no obligation to notify F&D of the Mullens loss prior to the time the bond was issued: in finding that the Bank discovered employee dishonesty before March 21, 1976, the district court committed legal error in applying a standard less favorable to the insured than the one applied in determining when an insured must file a notice of loss; under the standard of discovery used to determine when an insured must file a no-

---

**13.** We are at a loss to understand the sense in which the district court used "proved" when it stated that the Bank "pleaded and proved that it had knowledge of employee dishonesty" in the Employers litigation. 493 F.Supp. at 444. We say this because of course there was no court finding in the Employers litigation as to when discovery occurred, because there were conflicting reasons given for Potter's discharge, and because the proceeding on the motion to vacate the default judgment had centered not on when the Bank had discovered Potter's alleged dishonesty but on whether the Bank had demonstrated Potter's alleged dishonesty.

tice of loss, the relevant findings of fact by the district court do not support the conclusion that the Bank had sufficient knowledge of employee dishonesty to be required to disclose the Mullens losses to F&D before the effective date of the F&D fidelity bond. Finally, we believe that the district court incorrectly interpreted New Jersey law when it held that the Bank's conduct in the Employers litigation estopped it from claiming that it did not discover employee dishonesty until after the effective date of the F&D bond.

## VII.

The order of the district court rescinding the policy will be reversed and the case remanded for further proceedings consistent with this opinion.