**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3184
_____

DIEBOLD INCORPORATED,
                                        Appellant

v.

CONTINENTAL CASUALTY COMPANY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 1:07-cv-01991)
District Judge: Hon. Joseph E. Irenas
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 10, 2011

Before:  SCIRICA, AMBRO and VANASKIE, *Circuit Judges*

(Filed: June 9, 2011)

_____

OPINION
_____

VANASKIE, *Circuit Judge*.

Diebold, Inc. ("Diebold") filed this action against Continental Casualty Company ("Continental") seeking a declaratory judgment that Continental is required under a commercial crime insurance policy to provide coverage for certain losses caused by Tri-State Armored Services, Inc. ("Tri-State"). The District Court determined that the policy's discovery clause precluded coverage because the losses were caused after Diebold's Risk Management Department had discovered prior losses caused by Tri-State and, on that ground, granted summary judgment to Continental. We will affirm for substantially the reasons set forth in the District Court's comprehensive and well-reasoned opinion.

I.

We write solely for the parties and discuss the facts only to the extent necessary to address the issues Diebold raises on appeal.

Diebold contracts with banks to provide various ATM services. For a time, Diebold sub-contracted the "cash replenishment" or "cash handling" portion of its ATM services to Tri-State, a now-defunct armored car company. Under the arrangement, Diebold's customers would directly supply Tri-State with funds, usually by wire transfer or cash delivery, for Tri-State to replenish the ATMs. While in Tri-State's custody, significant amounts of Diebold's customers' money "disappeared and/or were stolen." (A. 1281.)

Diebold had notice of losses incurred by clients serviced by Tri-State as early as 1998. For instance, three Diebold managers were copied on a March 31, 1998 letter from

2

Sharonview Federal Credit Union (a Diebold client) to Tri-State "concerning the serious problem with our cash account currently serviced by Tri-State," with more than $100,000 being at issue. (A. 2389.) This correspondence was preceded by a January 20, 1998, letter to a Diebold customer service manager in which Sharonview demanded that Diebold pay it more than $100,000 "currently being held by [Tri-State], as a direct result of funds removed by them, from Sharonview's Cash Dispensers, from the period August 1, 1997 – December 31, 1997." (A. 2388.) On May 12, 1999, NIH Federal Credit Union wrote to Diebold's Vice President of Service "to inform you that several unexplained settlement differences have occurred in our ATM's that are currently being serviced by Tri-State . . . through a contractual relationship with Diebold." (A. 2417.) The letter requested that Diebold reimburse NIH in the amount of $67,420. (A. 2418.) A subsequent letter asserted that the shortages had grown to $119,570 and demanded that Diebold remit that amount to NIH. (A. 2419.)

Diebold was not contractually liable to its customers for the losses caused by Tri-State, but nonetheless decided to reimburse them. For example, on July 1, 1999, Diebold's "Manager of Risk Analysis," Jack J. Fortune, acknowledged NIH's claims and agreed to pay NIH $81,860. (A. 2421.) As the District Court related in considerable detail, prior to October 2000, there were numerous other instances of Diebold receiving notice of losses or shortages sustained by Diebold customers serviced by Tri-State, and Diebold then making payments to its customers.

In May 2000, Diebold was informed by the FBI that it was investigating a Tri-State official and suspected that the official may have taken "a rough sum of about $2 -

3

$6 [million] dollars." (A. 2474.) As a representative of Diebold, Fortune was informed of the FBI investigation suggesting theft by a Tri-State employee.

In July 2000, Diebold was informed by its client, SunTrust Bank, of shortages attributed to Tri-State exceeding $30,000. (A. 2422.) Fortune subsequently approved a payment by Diebold of $31,000 to SunTrust. (A. 2424-25.) In August 2000, Diebold's Director of Internal Audit received a telephonic status report from the FBI. His notes of the conversation state that there was "some indication of internal embezzlement at Tri-State that could exceed $15-16 million since 1997." (A. 2483.) On August 31, 2000, Fortune approved a payment by Diebold of $129,820 to First Union National Bank, writing that "[t]his is a theft that took place in February. . . . Either a Diebold or Tri-State employee (or former employee) stole the money." (A. 2450.)

Notwithstanding this extremely troubling information, Diebold did not sever its relationship with Tri-State, and Tri-State continued to service Diebold clients after August 2000. Significantly, after August 2000, Diebold continued to receive notice of losses incurred by its clients attributable to Tri-State. For example, in January 2001, Diebold was copied on a letter sent by United National Bank to Tri-State that listed ATM settlement issues from November 2000. Diebold also continued to reimburse client losses after August 2000. It was not until February 26, 2001, that Diebold terminated its relationship with Tri-State. On March 2, 2001, Tri-State filed a Chapter 7 bankruptcy petition.

Diebold initially sought to recover the amounts it had paid to its customers on account of Tri-State's conduct from Tri-State's insurer, but the insurer succeeded in

4

rescinding Tri-State's policy on the basis of equitable fraud. *See In re Tri-State Armored Servs., Inc.*, 366 B.R. 326 (D.N.J. 2007). Diebold then sought to recover the amounts it paid out and which its customers did not recover in the Tri-State bankruptcy – approximately $5.8 million – from its own insurer, Continental, under its "Commercial Crime Policy," which, in part, covers "direct loss of Money or Securities caused by actual destruction, disappearance or Theft while . . . in the care and custody of . . . an armored motor vehicle company." (A. 70.)

After Continental denied coverage for Diebold's claim, Diebold brought this action in the United States District Court for the District of New Jersey. Both parties moved for summary judgment with respect to Continental's affirmative defense that, "[p]ursuant to Section IV.C, the [policy] does not cover any loss caused by Tri-State after discovery of an actual or potential loss caused by Tri-State." (A. 419.) The District Court granted summary judgment in favor of Continental.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment under a plenary standard of review.[1] *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no

---

[1] In its brief, Continental challenges the District Court's determination that New Jersey law governs the dispute and argues that either Ohio or Illinois law should apply. It appears that Continental relies on Ohio or Illinois law only in its alternative argument that this Court should affirm the judgment on the ground that Diebold's claim is not covered under the policy. Because we do not reach this alternative argument, we see no need to review the District Court's choice of law analysis.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

In granting summary judgment in favor of Continental on the basis of its "discovery" defense, the District Court concluded that the losses for which Diebold seeks coverage were caused by Tri-State after Diebold had discovered an actual or potential loss caused by Tri-State. Continental's defense was based on the following last sentence of Section IV.C of the policy: "There is no coverage under this bond for any loss caused by a wrongdoer after discovery of an actual or potential loss caused by that wrongdoer." (A. 75.) Section IV.C also provides that "[d]iscovery occurs when the Risk Management Department of the Insured . . . first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond . . . has been or will be incurred." (*Id.*)

The District Court recognized that the availability of the "discovery" defense turned on the resolution of three issues. First, "when did the 'Claimed Funds' [– the money identified in Diebold's Proof of Loss submitted to Continental – ] come into Tri-State's possession?" (A. 20.) Second, when did Diebold "'become aware of facts which would cause a reasonable person to assume that a loss . . . has been or will be incurred'?" (*Id.*) And third, "which Diebold employees are encompassed by the term 'Risk Management Department,' as that term is used in the Policy?" (*Id.*)

6

A.

As to the first question – when did Tri-State come to possess the Claimed Funds – the District Court found that the earliest loss for which coverage is sought in this action occurred in October 2000. This determination was based upon the bankruptcy proofs of claim Diebold's customers had filed in Tri-State's bankruptcy proceeding. Diebold submitted its customers' proofs of claim to calculate the Claimed Funds in this action. In an exhibit to its Proof of Loss providing the "[d]etails of losses claimed," Diebold listed nineteen customers, the "loss amount" for each customer as indicated in the customer's proof of claim, the amount each customer received in Tri-State's bankruptcy, and the difference between those amounts or the "remaining claim." (A. 1555.) Diebold's total claim of approximately $5.8 million dollars represented the sum total of the "remaining claim" listed for each of the nineteen customers, plus legal fees. (*Id.*)

As the District Court explained, out of the nineteen proofs of claim filed in Tri-State's bankruptcy by Diebold's customers, fifteen proofs of claim identified the date on which the debt was incurred and four proofs of claim did not. Further, out of the fifteen proofs of claim that identified a date on which the debt was incurred, one proof of claim bore the earliest date: October 2000. Thus, October 2000 became "the operative date for the discovery analysis." (A. 29.) That is, the District Court had to determine whether any issue of fact existed as to whether, prior to October 2000, Diebold had discovered an actual or potential loss caused by Tri-State.

Although the District Court acknowledged that the fifteen proofs of claim are "arguably inadmissible hearsay" (A. 23), it determined that because Diebold relied on the

7

information in the proofs of claim in constructing its Proof of Loss, Diebold adopted as true the information contained in the proofs of claim. Diebold acknowledges that it relied on its customers' proofs of claim in constructing its own Proof of Loss, but nonetheless argues that there is "no evidence" that it intended to adopt *all* the information contained in those proofs of claim. (Appellant's Br. at 55.) Diebold thus contends that, in considering the "full contents" of its customers' proofs of claim, the District Court considered inadmissible hearsay. (*Id.*)

Contrary to Diebold's assertion, the District Court's consideration of the proofs of claim to ascertain the earliest date of loss did not abridge the hearsay rule. The "evidence" of Diebold's "adoption or belief" in the truth of the information contained in the proofs of claim was its very reliance on those proofs of claim for the purpose of quantifying its own losses. *See* Fed. R. Evid. 801(d)(2)(B) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth . . . ."); 4 Wigmore, Evidence § 1073 (Chadbourn rev. 1972) ("The party's use of a document made by a third person will frequently amount to an approval of its statements as correct, and thus it may be received against him as an admission by adoption." (emphasis omitted)). Indeed, Diebold's direct and apparently exclusive reliance on its customers' proofs of claim in setting forth its own claimed losses to Continental strongly manifests Diebold's assent to the accuracy and truth of the proofs of claim's general contents. We therefore do not find any error in the District Court's consideration of the dates Diebold's customers indicated on their proofs of claim as the dates the debts were incurred.

8

Diebold argues that even if the District Court properly considered the dates indicated on fifteen of its customers' proofs of claims as adoptive admissions, the dates are not dispositive of when the customers' losses were actually incurred. Diebold is correct; any adoptive admission of the information contained in Diebold's customers' proofs of claim constitutes an evidentiary admission that may be "controverted or explained." *Keller v. United States*, 58 F.3d 1194, 1198-99 n.8 (7th Cir. 1995). Diebold, however, did not produce any other evidence to establish when its customers' funds were lost or converted by Tri-State. Diebold argues that it in fact would be "impossible" to determine when the funds reflected on Diebold's customers' proofs of claim were either lost or converted by Tri-State.[2] (Appellant's Br. at 57.) This argument does not substitute for evidence controverting Diebold's adoptive admission on the issue of when Diebold's customers incurred losses. The proofs of claim state the dates when losses were sustained, and the inability of Diebold's expert to verify these dates does not mean that the losses were incurred at some time prior to October 2000. Accordingly, we find no error in the District Court's determination that the dates specified in the fifteen proofs of claim established when those fifteen customers' losses occurred.

Diebold raises a further challenge to the District Court's treatment of Diebold's customers' proofs of claim. As mentioned, four of Diebold's customers' proofs of claim

---

[2] Diebold's expert testified that, in the absence of a "subsidiary ledger," it would be impossible to determine the timing of Diebold's customers' losses because Tri-State commingled the customers' funds. (A. 3855-57.) According to the expert, the dates on the customers' proofs of claim "just happened to be the date[s] that [the customers] didn't get that replenishment completed by Tri-State," and did not reflect the actual date of loss or theft. (A. 3856.)

did not indicate the date on which the debt was incurred. Although acknowledging that Continental bore the ultimate burden of persuasion with respect to its defense that the amounts sought by Diebold concerned losses that occurred after Diebold's discovery of the wrongful diversion of funds, the District Court determined that Diebold bore the burden of production on the issue of the timing of Diebold's customers' losses. Relying upon *Griggs v. Bertram*, 443 A.2d 163 (N.J. 1982), the District Court reasoned that the burden was properly placed on Diebold because it was "far more likely to know, or have superior access to, facts relevant to when [Tri-State] came to possess the Claimed Funds."[3] (A. 27.)

Diebold argues that the burden of production was unfairly placed on it because, contrary to the District Court's assessment, Diebold was not in a better position to ascertain when Tri-State stole or otherwise caused the loss of Diebold's customers' funds. In this regard, Diebold reiterates its expert's testimony concerning the "impossibility" of determining the timing of the losses. While this argument may indicate the difficulty Diebold had in meeting the burden of production, it does not undermine the District Court's conclusion that Diebold, as the insured seeking coverage for losses sustained by its customers, was in a superior position to "at least make a prima

---

[3] In *Griggs*, the insured sought enforcement of a settlement it entered into with a third-party claimant after the insurer improperly disclaimed coverage. The court held that although the insurer had the ultimate burden of persuasion as to the reasonableness and good faith of the settlement, "[t]he initial burden of going forward with proofs of these elements rests upon the insured." 443 A.2d at 174. The court in part reasoned that this allocation of the burden of production made sense where the insured was in the position to "best marshal the basic facts relating to the settlement." *Id.* at 173.

10

facie showing that the loss dates occurred before the operative discovery date." (A. 28.) We conclude that, under the facts of this case, the District Court properly applied the holding in *Griggs* that the burden of production of evidence should be placed on the insured where, as here, it is reasonable to conclude that the insured has superior access to pertinent information. Accordingly, we do not find any error in the District Court's allocation of the burden of production and agree with the District Court that, in spite of the lack of record evidence demonstrating when the four banks' losses were incurred, Continental's motion for summary judgment did not fail for lack of evidence.

B.

After concluding that the earliest date of loss with respect to Diebold's Claimed Funds was October 2000, the District Court then had to determine whether, prior to October 2000, Diebold was aware of facts sufficient to cause a reasonable person to conclude that a covered loss had occurred. The District Court's opinion provides a thorough recitation of the numerous instances beginning in 1998 that Diebold's customers contacted Diebold concerning "cash shortages" and "out-of-balance conditions" occurring in ATMs serviced by Tri-State. It is further clear that, prior to October 2000, the FBI was in contact with Diebold concerning the agency's investigation of Tri-State and that Diebold was made aware that it could be a victim of Tri-State's theft. [4] In light of the evidence, which is more detailed in the District Court's opinion, we

_____

[4] Diebold contends that the District Court improperly considered numerous documents submitted as exhibits in support of Continental's motion for summary judgment, including correspondence between Diebold and its customers evidencing the customers' shortages and Diebold's frequent reimbursement of those shortages, because

11

agree that there can be no genuine dispute that, prior to October 2000, Diebold was aware of facts that "could only lead a reasonable person to conclude that a potential loss had been or would be incurred." (A. 30.)

Diebold argues that the "discovery" defense could only be established if Continental proved that Diebold knew not only of actual or potential losses, but also that those losses were the result of wrongdoing. The policy, however, explicitly provides that "[d]iscovery occurs when the Risk Management Department of the Insured . . . first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond . . . has been or will be incurred." (A. 75.) The "disappearance" of money in the care and custody of an armored car company is a "loss of a type covered by [the] bond." (A. 70.) Clearly, therefore, a loss may be "discovered" within the meaning of the policy without Diebold's knowledge of any wrongdoing on the part of Tri-State.[5]

---

the documents are inadmissible hearsay. The documents, however, were not considered for the truth of the matters asserted in them, but, rather, as evidence of Diebold's awareness of actual or potential losses caused by Tri-State prior to October 2000. Accordingly, the District Court did not err in considering them.

[5] Diebold relies on this Court's statement in *Fidelity & Deposit Company of Maryland v. Hudson United Bank*, 653 F.2d 766 (3d Cir. 1981), that "discovery" does not occur until "a bank has sufficient knowledge of specific dishonest acts to justify a careful and prudent person in charging another with dishonesty or fraud." *Id.* at 774. We, however, have already once refused to "assume that the general discovery principles we cited in *Hudson United* automatically apply" in a case where the "bond explicitly provides the applicable discovery definition at issue in [the] appeal." *Resolution Trust Corp. v. Fid. & Deposit Co. of Maryland*, 205 F.3d 615, 630 n.7 (3d Cir. 2000).

12

Finally, we address Diebold's arguments concerning the third question the District Court resolved:  Which Diebold employees are encompassed by the term "Risk Management Department"?  Throughout the period during which Diebold had actual knowledge of facts sufficient to conclude that a covered loss had been or would be incurred, Diebold's Risk Management Department was comprised of Mark Tucker, Director of Risk Management, one "Risk Analyst," and possibly, for a time, one individual who handled workers' compensation claims.  The District Court noted that the parties did not dispute that Tucker was not "contemporaneously aware" of Diebold's customers' shortages in ATMs serviced by Tri-State, Diebold's reimbursements to the customers, or Diebold's meetings with the FBI.  (A. 30.)  Diebold argued below and argues now that this fact is fatal to Continental's "discovery" defense.  The District Court rejected Diebold's argument, finding that, under the facts of this case, the term "Risk Management Department" encompassed Jack Fortune, the Diebold Manager of Risk Analysis who indisputably was aware of actual or potential losses caused by Tri-State prior to October 2000.

Diebold argues that the term "Risk Management Department" is clear and unambiguous, and that the District Court therefore erred in failing to apply the term literally to exclude Fortune, an employee within the Service Department.  We agree with the District Court that, under the particular circumstances of this case, a literal construction of the term "Risk Management Department" would produce an absurd result.  While Fortune's position was not within the "Risk Management Department," the

13

record establishes that Fortune managed risk for Diebold's ATM cash handling service. Tucker testified that Fortune was "brought into the services operations to help manage . . . risk from these cash losses" (A. 4063), and Diebold concedes that Fortune's position involved the management of risk "in some sense" (Appellant's Br. at 26). Fortune was involved in the investigation of Diebold's customers' ATM shortage claims and authorized check reimbursements for those claims. While Tucker managed risk on a "broad[] scale" (A. 4057), it is clear that Fortune, not just in "some sense," but in every practical sense, managed risk attendant to Diebold's cash handling service. Thus, we find no error in the District Court's determination that the term "Risk Management Department" encompassed Fortune.[6]

## IV.

Accordingly, for substantially the reasons set forth in the District Court's thorough and well-reasoned opinion, we will affirm the grant of summary judgment in favor of Continental.

---

[6] Diebold argues that even if the term "Risk Management Department" can be construed to include Diebold employees within separate departments of the company, the District Court erred in not submitting to a jury the issue of "Fortune's role and responsibilities at Diebold and whether he falls within the meaning of that phrase." (Appellant's Br. at 43.) Because we fail to see that any issue of fact existed concerning Fortune's "role and responsibilities," we reject this argument. *See Celanese Ltd. v. Essex Cnty. Improvement Auth.*, 962 A.2d 591, 600 (N.J. Super. Ct. App. Div. 2009) ("The interpretation of a contract is ordinarily a legal question for the court and may be decided on summary judgment unless there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation." (internal quotation marks omitted)).